Argued and submitted at Eugene, Oregon, November 7, 1980,
Accused removed from judicial office January 7,
petition for rehearing denied March 17, 1981 (290 Or 669, 624 P2d 1074)

In re: Complaint as to the Conduct of

# THE HONORABLE KIM L. JORDAN,
*Accused.*

(No. 5, SC 26959)

622 P2d 297

Alan B. Holmes, Medford, argued the cause for the Accused. With him on the briefs was Holmes & James, P.C., Medford.

William H. Fowler, Medford, argued the cause for the Commission on Judicial Fitness. With him on the brief was Heffernan, Fowler, Alley & McNair, Medford.

Before Tongue, Presiding Justice, and Howell, Lent, Linde, Peterson and Tanzer, Justices. *

PER CURIAM.

---

*Howell, J., retired effective November 30, 1980.

## PER CURIAM.

This matter is before the court under ORS 1.430 to review the record of proceedings before the Commission on Judicial Fitness conducted pursuant to Article VII (Amended), Section 8(1) of the Oregon Constitution.[1] Kim L. Jordan is a judge of the District Court for Josephine County. The Commission, based upon findings of fact on seven

[1] Article VII, Section 8(1) of the Oregon Constitution, as amended effective June 24, 1976, provides:

"In the manner provided by law, and notwithstanding section 1 of this Article, a judge of any court may be removed or suspended from his judicial office by the Supreme Court, or censured by the Supreme Court, for:

"(a) Conviction in a court of this or any other state, or of the United States, of a crime punishable as a felony or a crime involving moral turpitude; or

"(b) Wilful misconduct in a judicial office where such misconduct bears a demonstrable relationship to the effective performance of judicial duties; or

"(c) Wilful or persistent failure to perform judicial duties; or

"(d) Generally incompetent performance of judicial duties; or

"(e) Wilful violation of any rule of judicial conduct as shall be established by the Supreme Court; or

"(f) Habitual drunkenness or illegal use of narcotic or dangerous drugs."

ORS 1.420 provides:

"(1) Upon complaint from any person concerning the conduct of a judge or upon request of the Supreme Court, and after such investigation as the Commission on Judicial Fitness considers necessary, the commission may:

"(a) Hold a hearing pursuant to subsection (2) of this section, to inquire into the conduct of the judge; or

"* * * * *

"(2) The commission shall adopt rules of procedure governing all proceedings under this section. The hearings shall be private unless the judge whose conduct is subject of the hearing requests a public hearing. The judge shall have the right to be present and to be heard, to be represented by counsel and to present through witnesses any competent testimony relevant to the issue. Counsel shall have the right to cross-examine witnesses.

"* * * * *

"(4) If, after hearing or after considering the record and report of the masters, the commission finds that the conduct of the judge justifies censure, suspension or removal from office, the commission shall recommend to the Supreme Court the censure or suspension or removal of the judge.

"* * * * *"

ORS 1.430 provides:

"(1) The Supreme Court shall review the record of the proceedings under ORS 1.420 on the law and facts and may receive additional evidence. The

separate charges, concluded that Judge Jordan has been guilty of wilful misconduct in judicial office, which "bears a demonstrable relationship to the effective performance of (his) judicial duties";[2] that he had wilfully violated various Canons of the Code of Judicial Conduct adopted by this court on March 11, 1975;[3] and that he has been guilty of "generally incompetent performance of judicial duties." [4] The Commission has recommended, ORS 1.420(4), that Judge Jordan be suspended from his judicial office without pay for a period of six months.[5]

## Preliminary Contentions

At the beginning of the oral argument before this court, counsel for Judge Jordan raised two preliminary questions for the first time. First, he contended that the burden of proof in this proceeding should be proof "beyond a reasonable doubt," as in a criminal case, rather than proof by "clear and convincing evidence," as held by the Commission in its findings of fact. No such contention was made before the Commission or in either Judge Jordan's opening or reply brief in this court.

In *In the Matter of Field,* 281 Or 623, 629, 576 P2d 348 (1978), both parties agreed that proof should be clear

Supreme Court may censure the judge or it may order the judge suspended or removed from office.

"(2) Upon an order for removal, the judge shall be removed from office and his salary shall cease and his office is vacant on the date of such order.

"(3) Upon an order of suspension, the judge shall be suspended from office for the period specified in the order and his salary shall cease, if so ordered, from the date of the order until the end of the specified period. Suspension does not create a vacancy in the office of judge during the period of suspension."

[2] Oregon Constitution, Article VII (Amended), § 8(1)(b).

[3] Oregon Constitution, Article VII (Amended), § 8(1)(e).

[4] Oregon Constitution, Article VII (Amended), § 8(1)(d).

[5] The Commission concluded, however, that it does not believe that it can make a conclusion that Judge Jordan is at present generally incompetent to perform his judicial duties.

The Commission also recommended, based upon its observation of Judge Jordan, both on and off the witness stand during the hearings over a period of two and one-half days, that he "seek professional counseling during the period of suspension." Because of our disposition of this matter we need not, and do not, decide whether that recommendation is beyond the scope of the powers provided by Article VII, Section 8 of the Oregon Constitution.

and convincing, as in bar disciplinary cases, and we held that "the same standard should apply to members of the judiciary." Although the contention now made by Judge Jordan was not made by Judge Field, we are still of the same opinion.

The purpose of this proceeding, as in a proceeding to discipline an attorney, is not punishment, but the proper administration of justice for the public good. Such a proceeding is not a criminal proceeding and the burden of proof in such a proceeding, as in bar disciplinary cases, is proof by clear and convincing evidence, rather than proof beyond a reasonable doubt. *See, e.g., In re J. Kelly Farris,* 229 Or 209, 218-219, 367 P2d 387 (1961), and *In re Roger Rook,* 276 Or 695, 702, 705, 556 P2d 1351 (1976). Other courts which have considered the appropriate standard of proof for application in proceedings such as this have rejected the beyond-a-reasonable-doubt standard that controls criminal prosecutions, but require proof by clear and convincing evidence. *See In re Nowell,* 293 NC 235, 237 SE 2d 246, 254 (1977); *In re Hanson,* (Alaska) 532 P2d 303, 307-8 (1975); *Geiler v. Commission on Judicial Qualifications,* 10 Cal 3d 270, 110 Cal Rptr 201, 515 P2d 1, 4 (1973); and *In re Laughlin,* 153 Tex 183, 265 SW 2d 805, 809 (1954). No cases holding to the contrary have been cited by Judge Jordan.

■     As held in *Field* (at 629):

"In deciding whether the proof is clear and convincing, we review de novo and make our own independent evaluation of the evidence. We then decide whether the conduct, based on our findings of the facts, constitutes conduct proscribed by the Oregon Constitution."

In making this determination, however, as in disciplinary proceedings involving attorneys, this court may avail itself of the assistance provided by the work performed by the Commission on Judicial Fitness in its analysis of the evidence. As stated in *In re Moynihan,* 166 Or 200, 221, 111 P2d 96 (1941), although a bar disciplinary case:

"The trial committee that heard the witnesses 'is better qualified to determine disputed questions of fact than we who read the cold, printed record', and while its determination 'is not conclusive, it must, in the very nature of things, be entitled to respect.' See *Homan v. Hirsch,* 106 Or 98, 211 P. 795."

■    The second contention made by Judge Jordan at opening argument before this court is that after the Commission had found him guilty of the seven charges in the complaint he was and still is entitled to a separate hearing on the matter of the penalty to be imposed, at which the "community outpouring" in support of Judge Jordan can be offered for consideration before the Commission made its recommendation that he be suspended and before this court considers that recommendation. No such contention was made before the Commission. Because the Commission has the duty under ORS 1.420(4) to make a recommendation to this court of "censure or suspension or removal of the judge," such a contention should have been addressed to the Commission. In any event, we believe the nature of his misconduct to be such as to require his removal for reasons to be stated, regardless of any such "community outpouring."

We now proceed to a consideration of the various charges and the evidence in support of those charges.

## 1.  *The parking lot incident*

It is important to consider the charges relating to both the "parking lot incident" and the "communication prior to sentencing" in the context of a sequence of related events involving both Judge Jordan and Earl Best, then the Director of Correctional Services for Josephine County, a position which he described as "a county office dealing with probation, parole on a county level" under the supervision of the district judges of that county, including Judge Jordan.

At that time there was a work program called "Trailblazers" for inmates in the county jail. Those selected for participation in that program were transported by a bus to various job locations during the day. On August 27, 1978, it was discovered that some seats in that bus had been slashed.

Based upon complaints signed by Best, Felix Baldwin and Kent Hawkins were charged with slashing those seats, and Larry Smith was charged with throwing a county-owned canteen out the window of the bus. They were all arraigned before Judge Jordan without counsel and pleaded guilty.

Judge Jordan then sentenced Baldwin, Hawkins and Smith to one year in the county jail, to be served concurrently with their previous sentences of one year, on which each of them had served several months. As a result, Baldwin, Hawkins and Smith were sentenced to jail for several additional months.

All three defendants then secured counsel and filed motions to set aside their pleas of guilty and sentences on the ground that in pleading guilty they had relied upon promises of leniency by a police officer. Those motions were heard before another judge, who allowed the motions and permitted these defendants to withdraw their pleas of guilty.

On February 1, 1979, the local newspaper published a story which accused Judge Jordan of collaboration with Earl Best in tricking these defendants into pleading guilty.

A hearing was then held before Judge Cushing, another District Court judge, on February 9, 1979, at which both Best and Jordan testified. As a result of that hearing Best was discharged. Meanwhile, by letter dated February 2, 1979, Judge Jordan requested investigation of the matter by the Oregon Commission on Judicial Fitness.

The first charge of the complaint by the Commission is that:

"On or about 28 August 1978, Judge Jordan had a conversation with Director of Josephine County Probation Department Earl Best in the county parking lot concerning the slashing of seats in a county bus by members of the prisoner 'Trailblazer' work crew. At a subsequent hearing before Judge L.A. Cushing concerning the disciplining of Earl Best held on 9 February 1979, Judge Jordan denied under oath that the conversation with Earl Best in the parking lot on 28 August 1979 ever took place."

The answer by Judge Jordan denied the first sentence of that charge and admitted the second sentence (i.e., that on February 9, 1979, Judge Jordan denied under oath that such a conversation had taken place.)

The finding of fact by the Commission on this charge was as follows:

"On 28 August 1978, Judge Jordan had a conversation with director of Josephine County Corrections Department Earl Best in the county parking lot concerning the sentence that should be given members of a prisoner work crew for the slashing of seats in a county bus. At a subsequent hearing before Judge Laurence A. Cushing concerning the disciplining of Earl Best held on 9 February 1979, Judge Jordan denied under oath that the conversation with Earl Best in the parking lot on 28 August 1978 ever took place. In his letter dated 19 December 1979 responding to the Commission's Notice of Investigation, Judge Jordan denied the conversation with Best took place. Judge Jordan denied it took place in his Answer filed with the Commission. In this proceeding, Judge Jordan testified that if the conversation took place, he did not recall it. His testimony before the Commission on this issue was not credible. Bill Gragg was a disinterested and credible witness who heard the conversation take place. Judge Cushing testified that in a conversation he had with Judge Jordan in December 1978, Judge Jordan said he was not 'going to take any gas over this for Earl Best,' and Judge Jordan stated he would 'stand on' Best's head, 'cut his throat,' or 'stomp out his guts in order to survive this.' "

Upon examination of the record we find that on or about August 28, 1978, Judge Jordan had a conversation with Earl Best in the county parking lot "concerning the slashing of seats in a county bus by members of the prisoner 'Trailblazer' work crew," as alleged in the complaint. The complaint did not charge that the conversation was one which specifically "concern(ed) the *sentence* that should be given members of the work crew for the slashing of the seats," as found by the Commission. Yet the answer by Judge Jordan denies that there was even the more general conversation, as alleged in the complaint, and admits that such a conversation was denied by him under oath on February 9, 1979.

The evidence in support of this finding can be summarized as follows:

First, although Earl Best was equivocal in some parts of his testimony, he testified that on the morning after the slashing of the bus seats was discovered (fixed by other witnesses the morning of August 28, 1978) the bus was parked at the county parking lot adjacent to the

Josephine County Courthouse and that Judge Jordan walked up to the bus where Mr. Best and several other persons were gathered and wanted to know "what was going on." Best testified that "I explained that the seats had been slashed." He also testified that he and Judge Jordan stepped up together on the rear bumper of the bus and looked through its rear window. Best did not testify further to any specific conversation with Judge Jordan, but said that Bill Gragg, a probation officer, was "in and around the area."

Bill Gragg testified to the same effect as Earl Best. In addition, he testified that:

"* * * Judge Jordan asked if we knew who was responsible for the damage and Earl said, 'Yes, we know who did it,' and Judge Jordan asked if the complaint was going to be filed. Earl said, 'Yes, we'll file on them,' and about that point I was talking to John Murray. I'm not sure whether Earl said he would like to get them into Judge Jordan's courtroom or Judge Jordan said, 'Get them into my courtroom,' or whether Judge Jordan asked if the Probation Department a recommendation (sic). Earl Best said, 'Yes, the maximum,' and at that point the judge went into the building."

He also testified that:

"Mr. Best made the recommendation that the sentence be the maximum."

Mr. Gragg said that he reported that conversation to Dave Irons, another "security officer," later that morning. Although counsel for the Accused questioned Mr. Gragg's ability to remember that conversation after several months, he objected when Mr. Irons was called to testify to what he was then told by Mr. Gragg and that objection was sustained.

Judge Jordan testified that he had "no reason whatever to question Gragg's veracity about what he felt occurred"; that Bill Gragg "is generally regarded as being a truthful person," and that "it may have happened."

Judge Jordan also testified, however, that "I have not now and have not ever had any recollection of a prior conversation, * * * prior to the 29th of August" (the next day, when he talked with Mr. Best in his chambers about the incident) and that "I have no current recollection nor

have I ever at any time had a recollection of that meeting taking place."

At the hearing before Judge Cushing on February 9, 1979, there was no direct testimony about the parking lot incident. Judge Jordan was asked, however, "to comment upon any conversation that you had with Mr. Best prior to the sentencing of Baldwin or Hawkins * * * do you recall any conversation?" Judge Jordan then testified as follows:

> "Yes, I do. * * * My recollection is that it occurred in my outer office but well, that's my recollection, and the only thing I remember about that conversation is that Mr. Best told me about it for the first time. *I never heard of the incident before.* * * *" (Emphasis added)

Judge Jordan also testified that he was told in May 1979 that there might be a charge of perjury; that there was some evidence that he "had a prior conversation with Earl Best," and that in his appearance before a grand jury in June 1969 he was "asked the specific questions, what occurred, very much the story that Mr. Gragg told here today."

In a subsequent letter to the Commission dated December 19, 1979, Judge Jordan stated that:

> "I have consistently in the past, and do now, categorically deny that I *counseled* with Earl Best prior to August 29, 1978, concerning the 'Trailblazer' incident or the cases of State vs Baldwin, Hawkins and Smith." (Emphasis added)

As previously noted, Judge Jordan, by his answer to the complaint, filed on April 7, 1980, denied the allegation of the complaint that "on or about August 1978 (he) had a conversation with * * * Earl Best in the county parking lot concerning the slashing of seats in a county bus by members of the prisoner 'Trailblazer' work crew," and admitted the allegation of the complaint that on February 9, 1979, he had denied under oath that such a conversation "ever took place."

As also previously noted, at the hearing before the Commission Judge Jordan did not deny that such a conversation took place, but testified only that "I have not now

*and have not ever* had any recollection" of such a conversation or of "that meeting taking place." He also testified, however, that he never saw the slashed seats in the Trailblazer bus.

Yet the testimony by Judge Jordan demonstrated recollection of many details relating to other matters and he testified that he had a "pretty retentive memory." He did not try to explain how, if the conversation took place (which he does not now deny) he could truthfully testify that he *never* had any recollection of that conversation, as he testified at the hearing before the Commission (i.e., not even the next hour, day, week or month after that incident).

The Commission, which had the advantage of observing Judge Jordan as he testified, apparently disbelieved not only the testimony by Judge Jordan that he never saw the slashed seats of the bus, but also his testimony that he did not then and had "not ever had any recollection" of either a conversation with Earl Best in the parking lot on or about August 28, 1978, or of "that meeting taking place." The Commission also apparently found that when Judge Jordan denied under oath at the hearing on February 9, 1979, (as admitted by his answer) that he had such a conversation, and when he testified at that hearing that he "never heard of the incident before" a conversation with Earl Best on the day of arraignment he lied under oath. The Commission concluded that "Judge Jordan is guilty of wilful misconduct in his judicial office as a result of his giving false testimony under oath, which conduct bears a demonstrable relationship to the effective performance of his judicial duties," as provided by Article VII, Section 8(1)(b) of the Oregon Constitution.[6]

In considering the credibility of this testimony by Judge Jordan, the Commission, in its findings of fact, referred to the following testimony by Judge Cushing relating to a conversation with Judge Jordan at some date between December 14, 1978, and February 8, 1979. Judge Cushing testified that Judge Jordan then said, speaking of Earl Best:

[6] See note 1, supra.

"I'll stand on his head. I will cut his throat. I will stomp out his guts. I will do anything I have to do to survive this."

When asked if he made those statements, Judge Jordan testified:

"* * * I don't think I said it, but I certainly did indicate to Judge Cushing that if this thing became public I was probably not going to be able to protect Earl's confidentiality."

According to the brief filed in this court by Judge Jordan, any such conversation did not occur in December, as stated by the Commission in its finding, but that any such conversation did not occur before January 29, 1979. That brief also contends that:

"Without question the remark made to Judge Cushing, as appears in both by Judge Cushing's testimony and Judge Jordan's testimony, had nothing whatever to do with any alleged conversation in the parking lot of August 28. It referred only to the newspaper comments, and the issue of whether the guilty pleas were the result of a conspiracy between Judge Jordan and Earl Best to mislead the defendants."

It may be that these statements were made by Judge Jordan in late January with reference to the "issue" whether the guilty pleas were "the result of conspiracy between him and Earl Best to mislead the defendants." Nevertheless, if it were true there was a conversation between Judge Jordan and Earl Best at the parking lot on August 28, 1978, about the seat-slashing incident in which Jordan asked Best if he had a "recommendation" and Best said "Yes, the maximum," such a conversation, although not sufficient of itself to prove the alleged "conspiracy," would have been material evidence to support such an allegation. As such, Judge Jordan had reason at the Best hearing on February 9, 1979, to deny under oath that he had any conversation with Best at that time and to testify that he "never heard of the incident" at the parking lot before a later conversation with Earl Best on August 29, 1978.

Although the statements by Judge Jordan to Judge Cushing prior to the Best hearing that he would "do anything I have to do to survive this" did not necessarily prove

that Judge Jordan lied in denying knowledge of the parking lot incident, those statements at least tend to corroborate such a finding.

Based upon our independent examination of the record, we agree with the finding by the Commission on the first charge against Judge Jordan. In reaching this conclusion, we may agree with the present contention by Judge Jordan that the issue is not whether he conversed with Mr. Best in the parking lot on August 28, 1978, but whether "at the Best hearing on February 9, 1979, Judge Jordan consciously remembered the incident and meaningfully denied remembering."

■   We also agree with the conclusion by the Commission that the conduct of Judge Jordan in giving such false testimony constitutes misconduct in a judicial office which "bears a demonstrable relationship to the effective performance of his judicial duties," as provided in Article VII (Amended), Section 8(1)(b) of the Oregon Constitution. We believe that a judge cannot effectively perform his judicial duties when his integrity has been directly impugned, as in this case. We believe that such a conclusion is further supported by the facts of record relating to other charges against Judge Jordan, as will be noted in the course of this opinion.

The Commission also concluded that as a result of its finding of fact with reference to the charge against Judge Jordan he is also guilty of a wilful violation of Canon 2(A) of the Code of Judicial Conduct adopted by this court on March 11, 1975. As previously noted, Article VII (Amended), Section 8 (1)(e) provides that a judge may be removed, suspended or censured by this court for a "wilful violation of any rule of judicial conduct as shall be established by the Supreme Court * * *."[7]

Canon 2A of the 1975 Code of Judicial Conduct provides:

"A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

---

[7] See note 1, supra.

Again, based upon our examination of the record, we agree with that conclusion.

## 2. *The sentencing of Baldwin, Hawkins and Smith*

The second charge against Judge Jordan is that:

"On the morning of 29 August 1978, prior to arraigning three persons (Felix Baldwin, Kent Hawkins and Larry Smith) charged with the slashing of county bus seats, Judge Jordan had a conversation concerning the matter with the complainant in the case, Earl Best, in the judge's chambers, outside the presence of the defendants, their counsel, or counsel for the state. After that conversation, Judge Jordan arraigned the defendants, who were not represented by counsel, accepted their guilty pleas, and as a result of the ex parte communications with the complainant, sentenced the prisoners to the maximum sentence of one year in jail."

The finding of the Commission on this charge was that:

"On the morning of 29 August 1978, prior to arraigning Felix Baldwin, Kent Hawkins and Larry Smith on charges of criminal mischief and/or theft arising out of the incident involving the slashing of seats on a county bus, Judge Jordan had a conversation concerning the matter with the complainant in the cases, Earl Best, in the judge's chambers, outside the presence of the defendants, their counsel, or counsel for the state. After that conversation, Judge Jordan arraigned the defendants, who were not represented by counsel, accepted their guilty pleas, and as a result of the ex parte communications with the complainant, sentenced the prisoners to the maximum sentence of one year in jail. The Commission found Judge Jordan not credible in his letter to this Commission of 19 December 1979, in his Answer, and in his testimony. Judge Jordan denied that his ex parte communications with Best, prior to the arraignments and sentencings, influenced his judgment. Judge Jordan stated that the sentences given Baldwin and Hawkins were exclusively his, based on their criminal records, and the sentence given Smith was exclusively a product of the pre-sentence report."

The Commission found that testimony to be "not credible" for various reasons, including the following:

"(6) in a December 1978 conversation with Judge Cushing about the Baldwin, Hawkins and Smith cases, Judge Jordan said he knew he (Jordan) 'went in there

laying for those guys' and he knew he had been 'set up' by Best to do so.

"(7)   in his 9 February 1979 testimony in an inquiry into the conduct of Best before Judge Cushing, Judge Jordan stated he had been 'hoorahed' by Best."

It appears from the record that Mr. Best came to Judge Jordan's office in the morning of August 29, 1978. He told Judge Jordan that the defendants involved in the bus seat-slashing incident would be in court before him that day.

At the hearing on February 9, 1979, Judge Jordan testified that:

"* * * I was aware that Mr. Best felt that these people deserved * * * something more than the slap on the hands. * * * That they had something more coming than usual * * * that Mr. Best felt their conduct was quite serious. * * *"

Later that day Mr. Baldwin appeared in court before Judge Jordan without counsel and pleaded guilty to a charge of criminal mischief. Judge Jordan then inquired of the District Attorney "what his rap sheet was." Upon learning that Baldwin was then serving a sentence of one year in the county jail, of which he had served roughly one-half, Judge Jordan sentenced Baldwin to jail for one year "concurrent with what he was already serving." When Baldwin protested "that's a lot of time for just cutting the seats," Judge Jordan responded, "Gee, it's only five months * * *."

Mr. Hawkins then pleaded guilty to the same charge and was given the same one-year concurrent sentence, which Judge Jordan described as "roughly six months."

Mr. Smith then pleaded guilty to a charge of theft for throwing a canteen out of his window. Smith was 18 years of age and was described as "somewhat retarded." Instead of sentencing Smith at that time, Judge Jordan requested a presentence report on him. According to a deputy sheriff, the item that Smith was charged with theft of "was a canteen that had been physically destroyed by other people in this bus, and Mr. Smith was told to throw it out the window, which he did."

Mr. Best then assigned preparation of the presentence report to Marie Hill, who testified before the Commission that he told her that it had already been decided that Smith was to receive a maximum amount of time in jail. Upon completion of the report by her with a recommendation of a "substantial to maximum" sentence Mr. Best signed the report and delivered it to Judge Jordan. On August 31, 1978, Judge Jordan sentenced Smith to one year in the county jail, the maximum sentence.

As previously stated, the sentences of Baldwin, Hawkins and Smith were later set aside based upon motions, supported by their affidavits to the effect that they had been induced to plead guilty by promises made to them by a deputy sheriff that they would be treated leniently. They then received much lighter sentences by another judge. There is no suggestion that Judge Jordan was aware of any such promises when he sentenced them. Instead, the issue is whether, in sentencing them, he was influenced by previous, improper ex parte recommendations by Earl Best. Also in issue is the question whether Judge Jordan was truthful in denying any such influence.

Based upon our examination of the record we agree with the Commission in its finding to the effect that Judge Jordan was influenced by Mr. Best in imposing these sentences and that in denying such influence Judge Jordan was "not credible." We also agree that these findings are supported by clear and convincing evidence.

One of the facts referred to by the Commission in support of such findings was the testimony of Marie Hill that in preparing the presentence report she was told by Mr. Best that it had already been decided that Smith was to receive a maximum amount of time in jail. We agree with the contention by Judge Jordan in his brief that Best's statement to Marie Hill cannot properly be attributed to Judge Jordan. Her testimony does, however, explain the reason for the recommendation in the presentence report.

In any event, we find support for such findings in statements made by Judge Jordan himself. Thus, although Judge Jordan contends that the sentences of Baldwin and Hawkins represented his own independent judgment, he nevertheless later told Judge Cushing that:

"* * * I know I went in there laying for those guys, * * * I know I was set up and that Earl Best would have been the only person that could have set me up, * * *."

To the same effect, at the hearing on February 9, 1979, Judge Jordan recounted a conversation with Earl Best as follows:

" 'Earl, I think you hoorahed me.' And in Judge Cushing's presence I further said, 'Earl, I don't think there's anything you could have done that would have made me look stupider.' "

Judge Jordan was asked about that statement during the hearing before the Commission as follows:

"Q. Why do you say that made you look stupid when you now tell us you think it was a very appropriate sentence?

"A. Judge, I gave Larry Wayne Smith an appropriate sentence. I think that Larry Wayne Smith was inappropriate. I think that the sentence that Hawkins and Baldwin were given was appropriate. But I would not have given, nor do I believe, that Larry Wayne Smith was appropriate."

We do not understand that testimony, unless the first sentence was inaccurately reported.

Despite attempts by Judge Jordan in his brief to explain away his statements to Judge Cushing, and even though they were not conclusive admissions, we believe that they tend to support the finding by the Commission, with which we agree.

■        Based upon that finding of fact "and its relationship to other facts found by this Commission," the Commission concluded that Judge Jordan is guilty of wilful violation of Canon 3A(4) and 3C(1) of the 1975 Code of Judicial Conduct.[8]

Canon 3A(4) provides:

"A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law,

---

[8] The Commission also concluded that Judge Jordan is guilty of violation of various canons of the Canons of Judicial Ethics approved by this court in 1952. The adoption by this court in 1975 of the present Code of Judicial Conduct superseded the 1952 Canons of Judicial Ethics.

*neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding. * * *"* (Emphasis added)

Canon 3C(1) provides:

"A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

"(a)   he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; * * *."

Regardless of whether this conduct by Judge Jordan was in violation of his duties as stated by Canon 3C(1), we agree that such conduct was clearly in violation of his duties under the rule as stated in Canon 3A(4).

### 3.   *The Juanita Conner contempt proceeding*

The complaint by the Commission alleged that:

"On 19 May 1978, after a juror, Juanita Lorraine Conner, was sworn to serve in the case of the State of Oregon versus Robert Chester Wilhite, Judge Jordan held a special hearing in which the judge stated that several persons in the court room had told him that the juror, who had seen the judge earlier and had asked to be excused from jury service, uttered the words, 'oh, shit,' upon being told to stand and be sworn. Judge Jordan made the claim in open court to the juror after a recess of court, without advising her of any rights or opportunity to consult with counsel, and thus obtained her admission that since other persons had said it, she would not deny having said the words. Without any other evidence given to support the finding, Judge Jordan found Mrs. Conner in contempt, fined her $50 and sentenced her to two days in jail. Prior to the contempt hearing, Judge Jordan arranged to have a police matron present in the court room, apparently preparatory to taking the juror to jail. Of the persons present in the court room, only the district court reporter, Julia Witherington, indicated to Judge Jordan that she heard Mrs. Conner say anything and Witherington was only sure she heard the word, 'it.'"

The Commission found that:

"On 17 May 1978, during the trial of the case of *State of Oregon v. Robert Chester Wilhite,* Judge Jordan declared a recess of his court after the jury was selected and sworn.

During the recess, his Court Clerk-Recorder, Julia Witherington, told Judge Jordan she had heard a juror, Juanita Connor, utter the words, 'Oh, shit,' upon being told to stand and be sworn as a juror. Judge Jordan had heard the remark but, before his conversation with Witherington, had concluded a different juror, Bobby Barkley, had said the words. Judge Jordan then conducted an investigation outside the presence of Connor by making inquiries of the defendant, defense attorney, and deputy district attorney. In addition, Judge Jordan examined the jury questionnaire filled out by Connor and discussed the matter with Grants Pass Police Officer Ken Elbert and Judge Laurence A. Cushing. After the recess, Judge Jordan summoned Connor before him. Without advising her of any rights and without affording her any opportunity to consult with counsel or to seek a hearing before another judge, Judge Jordan obtained her admission that since other persons had said she said the words, she would not deny having said them. Without any other evidence given to support his finding, Judge Jordan found Connor in contempt, fined her $50 and sentenced her to two days in jail."

Upon examination of the record, we agree with this finding.

The testimony was that Mrs. Conner had been "belligerent" and had made it obvious that she did not want to serve as a juror, as reflected by her answers to questions on voir dire, but she was not challenged by either party. When told to stand and be sworn as a juror, she stooped over to put her purse on the floor and said under her breath "Oh, shit." The jury then retired and there was no "disruption" of any testimony, argument or other proceeding by that remark. The court clerk heard her say those words and reported them to Judge Jordan, who thought that he had heard some juror say those words, but thought it was another juror.

Judge Jordan then listened to the tape recording of the proceeding during the recess and found that it was not recorded on that tape. He also checked the jury questionnaire for Mrs. Conner, talked to a police officer about her, and asked counsel if they had heard what she said. The defense attorney thought he heard someone say those words but wasn't sure who said it. The state's attorney did not hear it.

Judge Jordan then excused the jury for noon recess, but told Mrs. Conner to stay. He then told her that "Your comment was clearly heard by several members of the court" and asked whether she denied saying it. Upon her admission that she "probably did," but that she "[didn't] remember," without further evidence Judge Jordan found that her conduct was in violation of ORS 33.010(a) by "disorderly, contemptuous or insolent behavior toward the judge," found her guilty of contempt, fined her $50, sentenced her to two days in jail, and had a police matron take her away in handcuffs, despite her protest: "Who's going to take care of my kids?" (two 13 year old twins).

Judge Jordan then made a written finding of contempt which stated that the remark by Mrs. Conner was "audible to most of those present in the courtroom, consisting of the rest of the jury, Defendant, Defendant's council (sic), witnesses for the State of Oregon, Deputy District Attorney, the Court and the reporter." Except as previously stated, there was no evidence to support those findings.

Assuming, without deciding, that Mrs. Conner was guilty of a direct contempt justifying the imposition of an immediate sentence without benefit of counsel and without a further hearing, and regardless of whether the penalty imposed upon her was excessive, the imposition of such a penalty based upon findings unsupported by, if not contrary to, the facts, cannot be justified. The complaint, however, did not charge Judge Jordan with misconduct in this respect.

■ The Commission concluded that by such conduct Judge Jordan was guilty of wilful violation of Canon 5 and 21 of the 1952 Canons of Judicial Ethics.[9] Because, however, the 1975 Code of Judicial Conduct had the effect of superseding the 1952 Canons of Judicial Conduct, we cannot consider the provisions of 1952 Canons 5 and 21. Such conduct might well come within Canon 3A of the 1975 Code

---

[9] Canon 5 provided:

"Essential Conduct. He should be temperate, attentive, patient, impartial; and, since he is to administer the law and apply it to the facts, he should be studious of the principles of law and diligent in endeavoring to ascertain the facts."

Canon 21 provided:

of Judicial Conduct, but because this charge was not based upon that canon, but only upon the 1952 canons, we do not consider it under Canon 3A. This is not to say, however, that this court approves the conduct by Judge Jordan in the Conner contempt proceeding. Quite the contrary. We also believe that the conduct by Judge Jordan in making findings unsupported by the facts, if not contrary to them, corroborates our previous finding that Judge Jordan was dishonest in his denial of the parking lot conversation.

### 4. *The Terry Campbell case*

The next charge is that:

"At a hearing in November involving a Terry Campbell, case number 76-2307-M, in which Mr. Campbell was represented by an attorney, Christopher D. Mecca, Judge Jordan made inquiries of Mr. Campbell and then stated, 'I know why you won't tell me why you've been drinking. It's because you're chicken shit.'"

The finding of the Commission was:

"At a sentencing hearing in November 1976 involving Terry Campbell, who was represented by his attorney, Christopher D. Mecca, Judge Jordan made inquiries of the defendant, Terry Campbell, and then stated, 'I know why you won't answer my questions. It's because you're chicken shit.'"

The brief on behalf of Judge Jordan concedes that "both the charge and facts in relation to this charge are undisputed." Judge Jordan also admitted that this conduct was a "mistake" which would not happen again.

The Commission concluded that this conduct by Judge Jordan was a wilful violation of Canon 3(A) of the 1975 Code of Judicial Conduct. Based upon that finding the Commission concludes that Judge Jordan is guilty of wilful

---

"Idiosyncracies and Inconsistencies. Justice should not be molded by the individual idiosyncracies of those who administer it. A judge should adopt the usual and expected method of doing justice, and not seek to be extreme or peculiar in his judgments, or spectacular or sensational in the conduct of his court. Though vested with discretion in the imposition of mild or severe sentences, he should not compel persons brought before him to submit to some humiliating act or discipline of his own devising, without authority of law, because he thinks it will have a beneficial corrective influence.

"In imposing sentence, he should endeavor to conform to a reasonable standard of punishment and should not seek popularity or publicity either by exceptional severity or undue leniency."

violation of Canon 3A(3) of the 1975 Code of Judicial Conduct, which provides:

"A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, * * *."

We agree with that conclusion.

5. *State v. Kueninger preliminary hearing*

The complaint next alleged that:

"On 22 August 1977, in a case involving a charge of rape of a daughter, State of Oregon versus Harry Kueninger, case number 77-314-F, after the testimony of the wife of the defendant was given in the preliminary hearing before Judge Jordan, Judge Jordan held a private conference in chambers with Mrs. Kueninger during which the woman admitted her involvement in the offense. When the District Attorney requested Judge Jordan to repeat her statement to the Grand Jury, Judge Jordan refused, stating that if subpoenaed, he would testify Mrs. Kueninger lacked the capacity to be a witness when Judge Jordan knew that was not the fact."

The Commission found that:

"On 22 August 1977, in the preliminary hearing of *State of Oregon v. Harry Kueninger* in which the defendant was charged with rape of his mentally retarded step-daughter, during the testimony of the defendant's wife, after explaining to her her constitutional rights, Judge Jordan permitted Mrs. Kueninger to refuse to testify on the grounds that she might incriminate herself. After the hearing was concluded, Judge Jordan held a private conference in his chambers with Mrs. Kueninger during which the woman admitted her involvement in the offense. When District Attorney Robert M. Burrows indicated that Judge Jordan would be called as a state's witness to repeat her statement, Judge Jordan stated that if subpoenaed, he would testify Mrs. Kueninger lacked the capacity to be a witness when Judge Jordan knew that was not the fact."

This charge against Judge Jordan is two-fold: (1) That during a preliminary hearing in a criminal case he improperly held a "private conference in his chambers" with a witness, and (2) that when told by the District Attorney that he would be called as a witness to repeat what the witness said to him, Judge Jordan stated that if subpoenaed he would testify that the witness "lacked the

capacity to be a witness when Judge Jordan knew that was not the fact."

■ Judge Jordan admits talking with the witness in his chambers. Obviously, he should not have done so. He did so, however, at the request of District Attorney Burrows, rather than on his own initiative. This did not make it proper for him to do so. It was a mistake in judgment for Judge Jordan to accede to that request, which reflects upon his competence as a judge. We do not believe, however, that under these circumstances he was guilty of any wilful impropriety.

The more serious charge is that Judge Jordan stated that he would testify that the witness "lacked the capacity to be a witness when Judge Jordan knew that was not the fact." Based upon our examination of the record, however, we find that this charge was not supported by clear and convincing evidence.

Judge Jordan testified that:

"I never have believed the woman lacked the mental capacity, it is possible I said she didn't have, in my judgment, a current emotional capacity to make a knowing waiver, but mental capacity as in being feeble minded, crazy, no, I was certainly not talking about that."

In our judgment, this explanation is plausible. The husband of Mrs. Kueninger had been charged with rape upon her 15 year old retarded daughter by a former marriage. At the preliminary hearing she was called by the state to testify against her husband. She was reluctant to do so. Apparently, however, she told Deputy Sheriff Lassiter that she wanted to talk to Judge Jordan. District Attorney Burrows then asked him to talk with her. Judge Jordan testified that she was emotionally distraught when she came into his chambers and immediately started to tell him of her complicity with her husband in his sexual intercourse with her daughter. Judge Jordan then left his chambers and found Mr. Burrows waiting for him.

The only witness who testified without equivocation that Judge Jordan said that the witness "lacked the capacity to be a witness" was District Attorney Burrows. Aside from the contention by Judge Jordan that in acceding

to the request by Mr. Burrows to talk to Mrs. Kueninger he was "set up" by Mr. Burrows, it appears from the record that there had been "bad blood" between Mr. Burrows and Judge Jordan for some time. Also, the primary interest of Mr. Burrows was to prosecute Mr. and Mrs. Kueninger. His interest in the case may have influenced his perception or his memory.

The most disinterested witness to the conversation was Deputy Sheriff Lassiter, who was with District Attorney Burrows when Judge Jordan came out of his chambers. The Commission, in its brief, relies upon the following testimony by Officer Lassiter:

"I'm not sure if that is the exact wording, and I understand that there possibly is some impact on the exact wording due to the fact that people have been talking with me, the investigators talking about this, and to the best of my memory really the judge indicated that he would not testify as to what Mrs. Kueninger had stated. He indicated to the best of my memory that she lacked the capacity to testify."

Officer Lassiter also testified as follows:

"Q. When you say she lacked the ability, she lacked mental capacity?

"A. Mental capacity.

"Q. Did he use those words?

"A. I'm not exactly sure of the words at that point in time whether he said mental capacity or mental competence. To the best of my memory it was mental capacity, but there was some legalistic terminology that was being used and *these are my words.*" (Emphasis added)

Although we find that Judge Jordan was not guilty of the charge that he had stated that he would testify that Mrs. Kueninger "lacked competence to be a witness when Judge Jordan knew that was not the fact," we believe that his handling of the Kueninger matter was such as to corroborate our finding that he was "incompetent," as also charged by the Commission in its complaint with reference to the Kueninger matter.

6. *State v. Parish. Trial without defendant*

The next charge against Judge Jordan is that:

"In a driving while suspended case against a Richard Lee Parish, case number 77-5994-T, the defendant was scheduled for trial before Judge Jordan on 10 June 1977. When Parish, the defendant, failed to appear, Judge Jordan had police officer Ron Hudson sworn, took his testimony that he saw Parish driving on a public highway, and subsequently, without any appearance by either Parish or counsel for Parish, entered a finding of guilty against Parish."

The Commission found that:

"In a driving while suspended case, *State of Oregon v. Richard Lee Parish,* the defendant was scheduled for trial before Judge Jordan on 10 June 1977. When Parish did not appear, either in person or by counsel, Judge Jordan swore the police officer, Ron Hudson, and, in his office, heard testimony about the matter off the record. Judge Jordan then had the matter reconvened in the courtroom on the record, stating the case was there on the district attorney's motion when in fact that was not true. In the courtroom, Officer Hudson testified he saw Parish driving on a public highway, and subsequently, without any appearance by either Parish or counsel for Parish, Judge Jordan entered a finding of guilty against Parish. The finding of guilty was never vacated."

The record reveals these facts. A "driving while suspended" case against Richard Parish was scheduled for trial before Judge Jordan on June 10, 1977. Neither the defendant nor his attorney appeared in court at that time. The state was represented by Scott Bridges, who had just passed the bar examination.

Mr. Bridges and Officer Hudson were talking to Judge Jordan in his outer office, waiting for the defendant to appear. After ten or fifteen minutes Judge Jordan proceeded to swear in Officer Hudson "across the counter" in his outer office. He then asked Officer Hudson if he had observed the defendant driving a motor vehicle upon a public highway. Officer Hudson said "yes." Judge Jordan said "guilty." They then went into the courtroom to put the proceeding "on the record."

According to the tape recording of that proceeding, Judge Jordan then stated:

"Let the record show that the defendant has been mailed a notice of this trial, has failed to appear and the

state has moved that the matter be tried in absence of defendant on..on account of his failure to appear after having received notice. Is that correct?"

To that Mr. Bridges answered "Yes, your honor." At the hearing before the Commission he denied having made a motion for trial in absentia and testified that:

"* * * We proceeded into the court and Judge Jordan opened the case with a comment that in his absence, and asked me, 'is that correct.' And I merely think that that is the procedure to follow and answered in the affirmative * * *."

Judge Jordan, in his testimony before the Commission, did not directly controvert this testimony by Mr. Bridges, except to state that:

"* * * All I can say is that I'm not in the habit of putting things on the record that I don't think represent the facts * * *."

In any event, Officer Hudson then testified on the record that he had seen Parish driving a motor vehicle on a public highway and exhibits were offered to prove the suspension of his driver's license and notice of that suspension. Judge Jordan then stated on the record:

"* * * The court will enter a finding of guilty in this case. * * * We will issue a warrant for his arrest and proceed with sentencing."

Judge Jordan also wrote the word "guilty" on the appropriate line of the back of the complaint against Parish, but did not sign that form. He also later concluded, after reading the statutes, that he had no authority to try the defendant in his absence. The warrant that was actually used was not for sentencing, but for failure to appear at trial. However, the finding of "guilty" was never vacated.

■ It may be, as contended by Judge Jordan, that the young district attorney made a motion for the trial "in absentia" and that the conviction of the defendant was a "nullity." Nevertheless, we believe that for a judge to commence with the trial of an absent defendant in any criminal case and to enter a finding of "guilty" at the conclusion of such a trial is not only a serious reflection

upon the competence of such a judge, but is misconduct of a serious nature.

The Commission, based upon its finding of fact on this charge, as previously stated, "and its relationship to the other facts found by this Commission," concluded that Judge Jordan is guilty of wilful violations of Canons 2A and 3A(4) of the 1975 Code of Judicial Conduct, as previously quoted. Wholly aside from the question whether his proceeding with the Parish trial in the absence of the defendant was a *wilful* failure to "comply with the law," as required by Canon 2A, we agree that this handling of the Parish matter was such as to constitute a wilful violation of his duty under Canon 3A(4) "to accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law * * *."

7. *State v. Weaver — bail hearing*

The final charge against Judge Jordan is that:

"In a bail hearing, State of Oregon versus Patricia Weaver, case number 79-145-C, involving charges of Attempted Murder, Burglary in the First Degree and Robbery in the First Degree, held before Judge Jordan on 17 May 1979, Judge Jordan failed to disqualify himself even though he was personally acquainted with and a friend of Patricia Weaver, had served on a library board with her, had stated to District Attorney Robert Burrows that it was incomprehensible to him that Weaver could have committed the act of attempted murder, and District Attorney Burrows had requested Judge Jordan to disqualify himself."

The finding by the Commission on this charge is that:

"In a bail hearing, *State of Oregon v. Patricia Weaver,* involving charges of Attempted Murder, Burglary in the First Degree, and Robbery in the First Degree, held before Judge Jordan on 17 May 1979, Judge Jordan refused to disqualify himself unless the defendant so requested even though he indicated an apparent prejudice."

The record reveals these facts. Mrs. Weaver was charged with the attempted murder of her husband and also with burglary and robbery. Her bail had been initially set at $250,000. Defendant's attorney, Mr. Swint, had moved for a bail hearing and asked the court to release

Mrs. Weaver on her own recognizance. The case was one of local notoriety and the courtroom was packed.

Before convening the hearing Judge Jordan invited counsel into his chambers to inquire whether they could settle the matter. He also told them that he wanted to disclose the fact that he was acquainted with Mrs. Weaver; that she was an extraordinary woman, having flown fighter bombers during World War II and that he couldn't believe that she would be charged with such an offense. Mr. Burrows, the District Attorney, then asked Judge Jordan to step aside from the matter, to which he responded: "Let's go into the courtroom and do this on the record."

Judge Jordan then stated in open court that he had discussed briefly with counsel the nature of his acquaintance with Mrs. Weaver, that he thought that his feelings "may very well be against *defendant's* position in this case," that he "had known and liked Mrs. Weaver" and asked: "Does the defendant join at this juncture in the state's motion?" to which Mr. Swint replied "No."

A second conference was then held with counsel in chambers, during which Mr. Burrows expressed surprise that Judge Jordan had not "stepped off the case." At the conclusion of that conference Judge Jordan said "Let's see if the system works," before returning to the courtroom.

Mr. Swint's understanding of the conclusion of that second conference was that if either party then asked Judge Jordan to step off the case he would do so. Mr. Burrows' understanding was that unless Mr. Swint joined in such a request "he was going to go ahead with the hearing."

When the hearing reconvened, Judge Jordan said:
"* * * the record should reflect that in chambers the court was requested by the defendant to proceed with the hearing forthwith and the defendant said if the state felt it had a motion to make it better go make it on the record and I don't know whether you've made that motion or not. If you do I'll ask the defendant how he responds to the motion."

Mr. Burrows then moved the court to continue the matter until another judge could be obtained. Mr. Swint did

not join in that motion. Judge Jordan then proceeded with the hearing and in its conclusion left defendant's bail at $250,000.

At the hearing before the Commission Judge Jordan was asked why he did not step off the case. He answered: "* * * I thought that once I had satisfied myself that the defendant was aware, that is the party to whom I was speaking, was aware and waived it, that cured the problem, legal and ethical."

Judge Jordan was asked:

"Would you agree with me today if I said to you that your continuance on the case seems to me to be an appearance of impropriety on behalf of the judge after having been requested by the state to disqualify yourself?"

To which question the judge answered:

"Yes, I think so."

In his brief in this court Judge Jordan contends that his acquaintance with Mrs. Weaver was "casual"; that his disclosure of that relationship demonstrated that he was candid and honest; that he would have disqualified himself if requested by Mr. Swint; that he was confident that he was not prejudiced; that his lack of prejudice was demonstrated by leaving the bail at $250,000, and that "there was no legal basis to prohibit Judge Jordan from sitting at the bail hearing."

■ It may be that under Oregon law there was "no legal basis" to require Judge Jordan to disqualify himself from sitting on this bail hearing. The question remains, however, whether his refusal to do so under these circumstances was a wilful violation of the provisions of Canons 2A and 3C(1) of the 1975 Code of Judicial Conduct, as concluded by the Commission.

Again, aside from the question whether the conduct by Judge Jordan in his handling of the bail hearing in *State v. Weaver* was such as to constitute a wilful failure to "comply with the law," as required by Canon 2A, we believe that his conduct of that hearing was such as to constitute a wilful violation of his duty under Canon 3C to "disqualify himself in a proceeding in which his impartiality might reasonably be questioned * * *."

*Summary*

The final conclusion by the Commission was as follows:

"As a result of all of the Findings of Fact and the general impression gained from hearing the testimony, viewing the evidence and particularly assessing the demeanor and credibility of Judge Jordan, the Commission has concluded that Judge Jordan has been guilty of generally incompetent performance of judicial duties in the instances determined in these Findings of Fact. Based upon the limited number of instances determined in these Findings of Fact, the Commission does not believe it can make a conclusion that Judge Jordan is at present generally incompetent to perform his judicial duties."

Based upon its various findings of fact and conclusions of law, the Commission recommended that Judge Jordan be suspended from his judicial office by this court without pay for a period of six months, with three dissenting members recommending that he be suspended for three months.

In considering this final conclusion by the Commission, as well as its recommendation of suspension, it is important to bear in mind the findings and conclusions of the Commission and of this court on each of the seven charges against Judge Jordan, which involved conduct extending over a period of more than two years and which may be summarized as follows:

1. In November 1976 Judge Jordan, in sentencing Terry Campbell, called him "chicken shit." Although perhaps not a matter of great seriousness, the conduct of Judge Jordan on that occasion was clearly contrary to his duty under Canon 3A(3), which requires that "a judge should be patient, dignified and courteous to litigants" — one of the most elementary rules of judicial conduct.

2. Seven months later Judge Jordan undertook to conduct a trial of a criminal defendant who was neither present personally nor represented by counsel. That conduct by Judge Jordan was not only impermissible under Oregon statutes, but clearly contrary to his duty under Canon 3A(4) to "accord to every person who is legally interested in a proceeding * * * full right to be heard

according to law," another elementary rule of judicial conduct.

3. Two months later, on August 22, 1977, Judge Jordan improperly talked with Mrs. Kueninger, a witness in a criminal preliminary hearing. Although he did so at the request of the District Attorney, and although in doing so he may not have violated the specific requirements of any of the canons of the 1975 Code of Judicial Conduct, the fact that he did so reflects seriously upon his general competence as a judge in criminal proceedings.

4. Nine months later, on May 19, 1978, Judge Jordan not only held Juanita Conner to be in contempt of court for saying "Oh, shit" in a low voice upon being selected as a juror, but fined her $50 and sentenced her to two days in jail based upon findings which stated that her remark was "audible to most of those present in the courtroom" when there was no evidence that such was the fact and the remark was not sufficiently audible to be recorded on the tape recording of the proceeding. Although the complaint did not charge misconduct in the making of findings unsupported by evidence, but charged only violation of the 1952 Canons of Judicial Ethics, which are no longer in effect, such conduct also corroborates our finding of Judge Jordan's lack of candor and honesty.

5. Three months later, on August 28, 1978, Judge Jordan had a conversation with Earl Best in a county parking lot about the slashed seats in a county bus. On February 9, 1979, he denied under oath that he ever had such a conversation. When later confronted with a witness to that conversation, he did not deny that he had such a conversation, but denied under oath that he ever saw the bus with the slashed seats and that he ever at any time had any recollection of that conversation. By giving what both the Commission and this court have found to have been false testimony under oath, Judge Jordan was guilty of "wilful misconduct" in his judicial office, which "bears a demonstrable relationship to the effective performance of (his) judicial duties," within the meaning of Article VII (Amended), Section 8(1)(b) of the Oregon Constitution. That conduct was also in clear violation of his duty under

Canon 2A to "respect and comply with the law," another elementary rule of judicial conduct.

■ 6. The next day, on August 29, 1978, Judge Jordan had a conversation in his office with Earl Best, the complainant in criminal cases which were to come before him that day for arraignment, outside the presence of the defendants or their counsel, and then arraigned the defendants without counsel, accepted their pleas of guilty and sentenced them to maximum sentences of one year in jail, all in violation of his duty under Canon 3A(4) not to "consider *ex parte* * * * communications concerning a pending * * * proceeding."

7. Nine months later, on May 17, 1979, Judge Jordon refused to disqualify himself from conducting a bail hearing involving Patricia Weaver as the defendant, despite statements by him that he "had known and liked Mrs. Weaver," in clear violation of his duty under Canon 3C to "disqualify himself in a proceeding in which his impartiality might reasonably be questioned."

■ Upon considering the conduct of Judge Jordan in each of these instances during a period of over two years, we agree with the conclusion by the Commission that he has been guilty of "generally incompetent performance of judicial duties" within the meaning of Article VII (Amended), Section 8(1)(d) of the Oregon Constitution during this period of time. We disagree, however, with the apparent conclusion by the Commission that the "number of instances" was too "limited" to provide a proper basis for a conclusion that Judge Jordan is "at present generally incompetent to perform his judicial duties," as well as its recommendation that Judge Jordan not be removed from office, but be suspended from office without pay for a period of six months. In our opinion, the conduct by Judge Jordan has been such as to compel the conclusion that for this court to properly discharge the responsibility imposed upon it by Article VII (Amended), Section 8(1) of the Oregon Constitution, this court must remove Judge Jordan from his position as a District Judge.

As stated by this court in *In the Matter of Field,* 281 Or 623, 637, 576 P2d 348 (1978):

"It is appropriate that we mention here that the district courts of this state are, in reality, the 'People's Courts,' and for many it may be the only contact they will ever have with our courts. The impressions they receive serve to shape their opinion of the judicial system, our laws and law enforcement. We cannot permit that opinion to be anything but one of confidence and respect.'"

As also stated by this court many years ago in *U'Ren v. Bagley,* 118 Or 77, 82-83, 245 P 1074 (1926):

"The law is not so much concerned with the respective rights of judge, litigant or attorney in any particular cause as it is, as a matter of public policy, that the courts shall maintain the confidence of the people: 15 R.C.L. 530. As stated in *People v. Suffolk Common Pleas,* 18 Wend. 550:

" 'Next in importance to the duty of rendering a righteous judgment, is that of doing it in such a manner as will beget no suspicion of the fairness and integrity of the judge.' "

To the same effect, *see State ex rel Lovell v. Weiss,* 250 Or 252, 255, 430 P2d 357, 442 P2d 241 (1968), and *State ex rel Strain v. Foster,* 272 Or 464, 470-71, 537 P2d 547 (1975).

In order to maintain the confidence of the people of Oregon in the courts of this state, it is essential that the judges of those courts be honest and competent judges. To accomplish that purpose, the Oregon Constitution was amended in 1976 to impose upon this court the duty and responsibility of suspending or removing from judicial office any judge found by it to be unfit for judicial office for any of the grounds set forth in that constitutional amendment. Article VII (Amended), Section 8(1).

These grounds include, among others: "generally incompetent performance of judicial duties" (the apparent basis for the Commission's recommendation of suspension), "wilful violation of any rule of conduct as shall be established by the Supreme Court," and "wilful misconduct in a judicial office" which "bears a demonstrable relationship to the effective performance of judicial duties."[10] Both the Commission and this court have found Judge Jordan to be guilty on all three of these grounds.

---

[10] See note 1, supra.

■ To be a competent judge it is not sufficient that a judge have legal knowledge and ability and be diligent, industrious and independent. It is also essential that a judge must have unquestioned integrity, together with a judicial temperament of fairness, patience, courtesy and common sense. Such a description of essential qualifications for a competent judge may be in terms too general to provide a proper basis for proceedings such as this, but at least some of these essential qualifications are the subjects of specific canons as set forth in the Code of Judicial Conduct adopted by this court in 1975.

■ Not only lawyers and litigants, including persons accused of crimes, but witnesses and jurors, as well as the public at large, are entitled to courts manned by judges who are competent judges at least in the sense that they have not been guilty of successive violations of the canons set forth in the Code of Judicial Conduct over a substantial period of time. The people of Oregon made this plain by the adoption in 1975 of Article VII (Amended), Section 8.

■ It may be too much to expect, as a practical matter, that all of the judges of this state will have and at all times exemplify all of these qualifications and will at all times comply with these canons of judicial conduct. Nevertheless, when it is brought to the attention of this court as the result of a proceeding by the Commission on Judicial Fitness under ORS 1.420, as in this case, (1) that a judge of an Oregon court has demonstrated by conduct in violation of specific canons of judicial ethics in a number of instances over a substantial period of time that he has not possessed qualifications which are essential for a competent judge, (2) that at least some of such violations have been wilful, and (3) that some of such violations have been of such a nature as to impugn the honesty and integrity of a judge, we believe that in the discharge of its constitutional responsibility to the people of Oregon this court must remove such a judge from his judicial office. We believe that this is such a case and that for these reasons this court may properly conclude that Judge Jordan is not only "generally incompetent (in the) performance of (his) judicial duties," and that he has been guilty of "wilful violations of * * * rule(s) of conduct * * * established by the Supreme Court," but that because some of such wilful misconduct has been

of such a nature as to impugn the honesty and integrity of Judge Jordan, it follows that his misconduct has been of such a nature as to "bear a demonstrable relationship to the effective performance of his judicial duties." In other words, we do not believe that a judge who has been guilty of wilful violations of the Code of Judicial Conduct and whose honesty and integrity have been found wanting can continue to function effectively as a judge.

For these reasons, it is the order of this court that Kim L. Jordan be, and he is hereby, removed from his judicial office as a District Judge.