882 P.2d 426

Rita JETT, Plaintiff/Appellee,

v.

CITY OF TUCSON, a municipal corporation; City Court of the City of Tucson, a municipal court; Mayor George Miller; Councilman Bruce Wheeler; Councilwoman Janet Marcus; Councilman Michael Haggerty; Councilman Roger M. Sedlmayr; Councilman Steve Leal; and Councilwoman Molly McKasson, Defendants/Appellants.

No. CV–94–0042–T/AP.

Supreme Court of Arizona,
En Banc.

Sept. 29, 1994.

Shelley & Bethea by J. LaMar Shelley, Gen. Counsel, Mesa, for amicus curiae League of Arizona Cities and Towns.

## OPINION

CORCORAN, Justice.

We are asked to determine whether a city council, acting under the authority provided by its city charter, may remove a magistrate from office for judicial misconduct. Because this issue affects numerous cities and towns in this state, we granted the court of appeals' petition to transfer the case to this court. We have jurisdiction pursuant to rule 19(c), Arizona Rules of Civil Appellate Procedure.

### FACTUAL AND PROCEDURAL BACKGROUND

Rita Jett had served as a magistrate for the City of Tucson for more than 8 years when she was reappointed in March 1993 for her third consecutive term. On June 21, 1993, the Tucson City Council held an executive session to discuss the events of June 12 involving Jett's alleged misconduct in releasing her live-in boyfriend from police custody. These events are set forth in detail in the companion case of *In re Jett,* 180 Ariz. 103, 882 P.2d 414 (1994), and therefore, we will not reiterate them here. At the end of the June 21 executive session, the City Council voted to suspend Jett from her position as magistrate.

The following day, Jett was served with a "Notice of Intent to Discharge." The notice informed Jett that a hearing would be held on June 28, at which time she would be given an opportunity to present reasons why the proposed discharge should not occur. Both Jett and her attorney were present at the June 28 hearing, and both participated in the proceedings. Jett and other witnesses testified and were questioned by council members. After the hearing, the City Council removed[1] Jett from office pursuant to its

O'Dowd, Burke & Lundquist, P.C. by Bruce A. Burke, Tucson, for plaintiff/appellee.

Office of the Tucson City Atty. by Tobin Rosen, Tucson, for defendants/appellants.

---

1. We note that any reference in this opinion to "removal" by the City Council should be distinguished from removal by this court upon recommendation of the Commission on Judicial Conduct. When removed from office by a city or town council, a magistrate is essentially dis-

charged for the remainder of his or her term in office. On the other hand, however, "a judge removed by the supreme court is ineligible for judicial office in the state." Ariz. Const. art. 6.1, § 4(B).

authority under chapter 5, § 4.1 of the Tucson City Charter.

On August 18, 1993, Jett filed a complaint in the Pima County Superior Court naming the City, the Mayor, and the individual members of the City Council as defendants. She alleged, *inter alia,* that the City Council did not have the authority to remove her from office. She sought reinstatement, damages, and attorney's fees and costs. In addition, she asked the court to issue a temporary restraining order preventing the City from hiring a replacement to fill her position pending a final ruling in this case. The court denied the request for a restraining order.

The parties then filed cross-motions for summary judgment. On November 12, after oral argument, the trial court granted Jett's motion and denied the City's cross-motion. The court concluded that the 1988 amendment to article 6.1 of the Arizona Constitution, which brought city magistrates within the jurisdiction of the Commission on Judicial Conduct, divested the City Council of its authority to remove Jett for judicial misconduct. On January 3, 1994, the court entered judgment ordering Jett's reinstatement and awarding her back pay and attorney's fees. The City filed a timely notice of appeal. The court of appeals filed a petition to transfer the case to this court pursuant to rule 19(a)(3), Arizona Rules of Civil Appellate Procedure. We granted the court of appeals' petition on February 4, 1994, and for the reasons discussed below, we reverse the trial court's judgment.

## DISCUSSION

Article 6.1 of the Arizona Constitution is the provision that vests the Commission on Judicial Conduct with authority to initiate disciplinary proceedings against certain members of the judiciary. Specifically, § 4 of article 6.1 provides:

> On recommendation of the commission on judicial conduct, the supreme court ... may censure, suspend without pay or remove a judge for action by him that consti-

tutes wilful misconduct in office, wilful and persistent failure to perform his duties, habitual intemperance or conduct prejudicial to the administration of justice that brings the judicial office into disrepute.

When the Commission was created in 1970, its jurisdiction was limited to "justices of the peace, judges of the superior court, judges of the Court of Appeals and justices of the Supreme Court." *See* Ariz. Const. art. 6.1, § 5; Laws 1970, H.C.R. No. 23, § 1. At that time, no constitutional or statutory provision specifically addressed the removal of city magistrates from office. Absent such a provision, some cities adopted their own removal provisions, which they generally incorporated into their city charters.

In 1988, however, the Commission was granted authority to initiate disciplinary proceedings against city magistrates. More precisely, § 5 of article 6.1 was amended to bring within the Commission's jurisdiction "judges in courts inferior to the superior court," which includes city magistrates. *See* Laws 1988, H.C.R. No. 2009; *see also Bruce v. State,* 126 Ariz. 271, 272, 614 P.2d 813, 814 (1980).

The primary issue presented by this case is what effect, if any, the 1988 amendment had on the City's authority to remove its magistrates from office. Jett contends that the amendment divested the City Council of its authority, and therefore, its actions in removing her from office: (1) were "inconsistent with" both the Arizona Constitution and the laws of the state; and (2) violated the separation of powers doctrine. We address each contention below.

### I. *Article 6.1*

■ The City of Tucson is a charter or "home rule" city organized pursuant to article 13, § 2 of the Arizona Constitution.[2] As such, it may exercise all powers granted by its charter, provided that such exercise is not inconsistent with either the constitution or general laws of the state. *See Strode v. Sullivan,* 72 Ariz. 360, 362–64, 236 P.2d 48,

---

2. Article 13, § 2 provides:
   Any city containing, now or hereafter, a population of more than three thousand five hundred may frame a charter for its own government consistent with, and subject to, the Constitution and the laws of the State. . . .

50–51 (1951), discussing Ariz. Const. art. 13, § 2. In this case, the City Council removed Jett from office under the authority provided by the City's charter, which reads in relevant part:

> City magistrates shall be appointed by the mayor and council and shall hold office for the terms hereinafter provided, *unless sooner removed* by two-thirds of the council voting affirmatively therefor....

Tucson City Charter, ch. 5, § 4.1 (1978) (emphasis added). Our first inquiry, therefore, is whether this charter provision is "inconsistent with" article 6.1 of the Arizona Constitution.

Jett argues that article 6.1 granted the Commission exclusive authority to initiate disciplinary proceedings against city magistrates. As such, she maintains that even if the City Council had authority before 1988 to remove city magistrates from office, once § 5 of article 6.1 was amended to bring magistrates within the jurisdiction of the Commission, the City Council was divested of any such authority. For a number of reasons, we disagree.

When interpreting the scope and meaning of a constitutional provision, we are guided by fundamental principles of constitutional construction. Our primary purpose is to effectuate the intent of those who framed the provision and, in the case of an amendment, the intent of the electorate that adopted it. *McElhaney Cattle Co. v. Smith*, 132 Ariz. 286, 289, 645 P.2d 801, 804 (1982), citing *Apache County v. Southwest Lumber Mills, Inc.*, 92 Ariz. 323, 327, 376 P.2d 854, 856 (1962). To this end, we first examine the plain language of the provision. *Perini Land and Dev. Co. v. Pima County*, 170 Ariz. 380, 383, 825 P.2d 1, 4 (1992). If the language is clear and unambiguous, we generally must follow the text of the provision as written. No extrinsic matter may be shown to support a construction that would vary its apparent meaning. *McElhaney Cattle Co.*, 132 Ariz. at 290, 645 P.2d at 805. In short, judicial construction is neither necessary nor proper. *Pinetop–Lakeside Sanitary Dist. v. Ferguson*, 129 Ariz. 300, 302, 630 P.2d 1032, 1034 (1981).

With these principles in mind, we turn to the language of article 6.1 itself. Initially, we note that the provision does not expressly confer upon the Commission *exclusive* authority to initiate proceedings for the removal of magistrates from office. Nor does it expressly *prohibit* cities from authorizing in their city charters a parallel process of removal. It merely authorizes the Commission to investigate a magistrate's misconduct and recommend an appropriate sanction, after which this court "*may* remove" the magistrate from office. Ariz. Const. art. 6, §§ 4 and 5; *see also Bruce*, 126 Ariz. at 272, 614 P.2d at 814 (recognizing that city magistrates are considered "judges in courts inferior to the superior court"). Standing alone, the permissive language of article 6.1 by no means represents an exclusive grant of authority. Instead, contrary to Jett's suggestion, such permissive language seems to allow for parallel processes of removal.

The fact that article 6.1 is not clear on its face, however, permits us to look beyond the bare words of the provision to discern its intended effect. *McElhaney Cattle Co.*, 132 Ariz. at 290, 645 P.2d at 805, citing *American Bus Lines, Inc. v. Corporation Comm'n*, 129 Ariz. 595, 633 P.2d 404 (1981), and *Ward v. Stevens*, 86 Ariz. 222, 344 P.2d 491 (1959). In particular, we may consider the history behind the provision, the purpose sought to be accomplished, and the evil sought to be remedied. *See McElhaney Cattle Co.*, 132 Ariz. at 290, 645 P.2d at 805; *Ruth v. Industrial Comm'n*, 107 Ariz. 572, 575, 490 P.2d 828, 831 (1971).

The amendment to § 5 of article 6.1, which was aimed at bringing magistrates within the jurisdiction of the Commission, was offered to qualified voters as Proposition 102. Before the election, the Secretary of State prepared and distributed a publicity pamphlet to apprise the voters of the purpose and intent behind the amendment. This publicity pamphlet contained a legislative council analysis of the proposition, legislative council arguments favoring and opposing the proposition, and citizens' arguments "for" the proposition. "Although this background material is not necessarily controlling in all cases, it is enti-

tled to some weight." *Ward,* 86 Ariz. at 229, 344 P.2d at 495.

■ As the publicity pamphlet accompanying Proposition 102 indicates, the amendment's primary purpose was to subject the conduct of magistrates to oversight by the Commission. The fact that magistrates previously had been excluded from the Commission's jurisdiction was regarded as an anomaly, especially considering that they were subject to the same high standards as all other judges in the state, i.e., those set forth in the Code of Judicial Conduct. *See* rule 81, Arizona Rules of the Supreme Court. Simply put, the amendment was intended to correct this omission.

But the correction of an apparent oversight was not its only purpose. Indeed, the citizens' arguments "for" the proposition reveal that the driving concern behind the amendment was the perceived unaccountability of magistrates. This concern is readily discernable, for example, in an argument advanced by the State Bar of Arizona, which stated in part:

> The most significant proposed change is to include all state judges in Arizona within the jurisdiction of the Commission. At the present time municipal court judges are excluded. This means that citizens who have complaints about those judges have nowhere to direct the complaints except to the mayors and city councils, who in some instances do not have the administrative procedures to handle such complaints.

In addition, the President Emeritus of the Arizona Magistrates Association argued in part that:

> Under the existing Arizona Constitution, there is no single location for a citizen or group to file an ethical complaint against a city magistrate, with knowledge that an investigation will follow. A city council may consider a complaint, but may decline to do so.... That situation can lead to public dissatisfaction and frustration with the legal system when no one will listen, and no one will act.

■ As these arguments implicitly acknowledged, when the amendment was proposed, cities had the authority to remove their magistrates from office. Yet, like the language of article 6.1 itself, the publicity pamphlet contains nothing to indicate that the amendment was intended to divest the cities of such authority. To the contrary, the amendment's intended effect was to provide citizens an *additional* agency with which they could lodge their complaints regarding a magistrate's alleged misconduct.

In our opinion, an interpretation of the amendment that accommodates parallel processes of removal furthers its underlying purpose, i.e., providing citizens with added protection against magistrates who engage in misconduct. By preserving a city's authority to remove its magistrates from office, such an interpretation places magistrates in the same position as all other judges in the state, who are subject to removal by means other than a disciplinary proceeding initiated by the Commission.

To illustrate this point, we refer to those means by which judges other than magistrates may be removed from office. Specifically, we note that all "judicial officers, except justices of courts not of record," may be removed by the Legislature through the process of impeachment.[3] *See* Ariz. Const. art. 8, pt. 2, § 2. Moreover, all judges holding elective office may be removed by the citizens through the process of recall.[4] Ariz. Const. art. 8, pt. 1, § 1. The adoption of article 6.1 in 1970, which created the Commission and granted it authority to initiate disciplinary proceedings against such judges, divested neither the Legislature of its power to impeach nor the citizens of their power of recall. Rather, article 6.1 merely provided citizens with added protection against judicial misconduct.

We see no compelling reason to interpret the language of article 6.1 differently where a city's authority is concerned. Like the powers of impeachment and recall, a city charter

---

3. A municipal court is not a record court, and therefore, magistrates are not subject to impeachment. *See* Ariz. Const. art. 6, § 30; A.R.S. § 22–426(A) and (C).

4. Because magistrates do not hold elective office, they are not subject to recall.

is itself of constitutional origin. *City of Tucson v. Tucson Sunshine Climate Club,* 64 Ariz. 1, 4, 164 P.2d 598, 599 (1945). As such, we are reluctant to deprive a city of the authority provided by its city charter absent a clear finding that it is inconsistent with either the constitution or general laws of the state.

  For the reasons explained above, we find that the City's charter—which merely authorizes a parallel process for removal of its magistrates from office—is not inconsistent with the Arizona Constitution. In doing so, we likewise reject Jett's contention that the amendment to § 5 of article 6.1 divested the City Council of its authority to remove her from office. Our next inquiry, therefore, is whether the City's charter is inconsistent with the general laws of the state.

## II. *Preemption*

In what amounts to a preemption argument, Jett claims that the City's charter is inconsistent with the state laws that provide cities with limited authority to "employ" magistrates. Jett refers to Title 22 of the Arizona Revised Statutes, and in particular to § 22–403(A), which states:

> The presiding officer of the municipal court shall be a magistrate, who shall be selected in a manner provided by the charter or ordinances of the city or town. The magistrate shall receive such compensation as provided by the governing body of the city or town.

Although the Legislature has expressly delegated to cities the authority to appoint and provide compensation for city magistrates, Jett notes that it has remained silent regarding a city's authority to remove such magistrates from office. Based upon this fact alone, Jett argues that the City was precluded from authorizing in its city charter a process for the removal of its magistrates from office by the City Council. We find this argument unpersuasive.

  When the state has legislated in a particular area, whether that legislation preempts or precludes a city from legislating in the same area depends on: (1) whether the subject is of statewide concern; and (2) whether the state legislation has appropriated the field. *See, e.g., State v. Mercurio,* 153 Ariz. 336, 340, 736 P.2d 819, 823 (App.1987). As this court has previously recognized,

> both a city and a state may legislate on the same subject when that subject is of local concern or when, though the subject is not a local concern, the charter or particular state legislation confers on the city express power to legislate thereon; but where the subject is of statewide concern, and the legislature has appropriated the field by enacting a statute pertaining thereto, that statute governs throughout the state, and local ordinances contrary thereto are invalid.

*Flagstaff Vending Co. v. City of Flagstaff,* 118 Ariz. 556, 559, 578 P.2d 985, 988 (1978), quoting *Phoenix Respirator & Ambulance Serv., Inc. v. McWilliams,* 12 Ariz.App. 186, 188, 468 P.2d 951, 953 (1970).

  We acknowledge that the removal of city magistrates from office is a subject of statewide concern. *Cf. Winter v. Coor,* 144 Ariz. 56, 59, 61, 695 P.2d 1094, 1097, 1099 (1985) (finding magistrate courts part of state's integrated judicial department and recognizing importance of public's perception of such courts). Thus, the relevant issue is whether "the state legislation has so completely occupied the field that it becomes the sole and exclusive law on the subject," *Mercurio,* 153 Ariz. at 340, 736 P.2d at 823, leaving no room for the City's charter provision to supplement its authority to act in the area.

  For a court to find that state legislation has completely occupied the field in a particular area,

> [t]he existence of a preempting policy must be clear. Also, the assertedly competing provisions in question must be actually conflicting, rather than capable of peaceful coexistence. Mere commonality of some aspect of subject matter is insufficient. . . .

*City of Prescott v. Town of Chino Valley,* 163 Ariz. 608, 616, 790 P.2d 263, 271 (App.1989), *vacated in part on other grounds,* 166 Ariz. 480, 803 P.2d 891 (1990) (citations omitted). In this case, however, the City's charter provision is not "contrary to" either § 22–403(A)

or any other provision in Title 22. Of course, the mere fact that both the City's charter provision and Title 22 touch upon a common subject is insufficient to render the City's charter provision invalid. And, although Title 22 contains a number of provisions that bear upon the operation of municipal courts, it does not represent the sort of comprehensive statutory scheme from which we can infer an obvious preemptive policy.

■ As Jett concedes, Title 22 is *silent* regarding a city's authority to remove its magistrates from office. We think that "[a] rule of statutory construction that requires us to presume that such silence is an expression of legislative intent is somewhat artificial and arbitrary." *Lowing v. Allstate Ins. Co.,* 176 Ariz. 101, 106, 859 P.2d 724, 729 (1993). Accordingly, in this case, we will not infer from the fact that the Legislature has addressed some areas concerning the employment of magistrates, while remaining silent on others, an intent to preempt cities from authorizing in their city charters the removal of their magistrates from office. *Cf. Hayes v. Continental Ins. Co.,* 178 Ariz. 264, 272, 872 P.2d 668, 676 (1994) (discussing reluctance to imply preemption absent clear expression of legislative intent). We therefore find that the City's charter is not inconsistent with the general laws of this state.

## III. *Separation of Powers*

Jett also contends that chapter 5, § 4.1 of the Tucson City Charter violates article 3 of the Arizona Constitution, which provides:

> The powers of the government of the State of Arizona shall be divided into three separate departments, the Legislative, the Executive, and the Judicial; and, except as provided in this Constitution, such departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others.

Jett argues that the City's charter provision violates the separation of powers doctrine because it interferes with this court's authority to discipline members of the judiciary. She maintains that the existence of parallel processes for the removal of city magistrates would result in an intolerable power struggle between two branches of government—i.e., a municipal legislative body and a statewide judicial body.

We have previously addressed a separation of powers issue similar to that presented by Jett. Specifically, in *Winter v. Coor,* 144 Ariz. 56, 695 P.2d 1094 (1985) we reviewed the constitutionality of town codes that authorized their town councils to remove magistrates from office at will. After determining that magistrates are part of the integrated judicial department of this state, we noted that "judicial independence requires that magistrates be insulated from arbitrary removal without cause." *Winter,* 144 Ariz. at 59, 64, 695 P.2d at 1097, 1102. We therefore held that those provisions in the town codes that permitted the removal of city magistrates at will violated the separation of powers doctrine enunciated in article 3 of the Arizona Constitution. We went on to state, however, that "a magistrate may still be removed at any time for cause after a due process hearing." *Winter,* 144 Ariz. at 64, 695 P.2d at 1102.

Despite acknowledging that our statement in *Winter* bears directly upon the issue presented in this case, Jett correctly notes that *Winter* preceded the amendment to § 5 of article 6.1. She maintains that this amendment, which brought city magistrates within the jurisdiction of the Commission, vested the judicial branch of government with exclusive authority to remove magistrates. Consequently, she claims that the removal of city magistrates by city council members, who act as the legislative branch of city government, violates the separation of powers. We disagree.

■ This court has previously acknowledged that "[t]he separation of powers does not require a 'hermetic sealing off' of the three branches of government." *State v. Prentiss,* 163 Ariz. 81, 84, 786 P.2d 932, 935 (1989). Thus, the fact that one branch of government has authority to act in a particular area does not necessarily preclude another branch from acting in the same area. The legislative, executive, and judicial branches of government share common boundaries, and

as a result, the authority of each branch cannot always be strictly compartmentalized.

Rather than mandating a strict separation between the branches of government, the separation of powers doctrine protects each branch against overreaching by the others. *Prentiss,* 163 Ariz. at 84–85, 786 P.2d at 935–36. As our opinion in *Winter* recognized, when magistrates may be removed at will, they become particularly susceptible to political pressure by local councils. Such potential for political pressure impermissibly threatens the judicial independence of magistrates and, consequently, violates the separation of powers doctrine. On the other hand, when magistrates may be removed only for cause after a due process hearing, their judicial independence is adequately safeguarded.

Our conclusions in *Winter* remain valid today, and thus we hold that when cities remove a magistrate for cause after a due process hearing, article 3 of the Arizona Constitution is not violated.[5] Unlike Jett, we do not believe that parallel processes of removal necessarily result in an intolerable power struggle between two branches of government. As we explained in the first section of this opinion, all other judges in the state may be removed from office either by impeachment or by recall. A holding contrary to the one we have reached today would have the incongruous result of affording magistrates greater protection under article 3 than that of all other judges in the state. We find no reason to reach this result.

Although we continue to acknowledge "the necessity of maintaining magistrate courts as fair, independent, and impartial tribunals," *Winter,* 144 Ariz. at 61, 695 P.2d at 1099, our holding today in no way undermines that goal. To the contrary, as

long as magistrates are appointed for a term long enough to insulate them from pressure[6] and are removable only for cause after a due process hearing, their judicial independence is adequately protected. Moreover, citizens are provided with greater protection against judicial misconduct. If one branch of government is not responsive to their concerns, then citizens can turn to another branch for assistance.

Finally, we do not agree with Jett that parallel processes of removal interfere with this court's authority to discipline members of the judiciary. We remain the ultimate arbiter of whether a city has comported with the requirements of "cause" and "due process," and therefore this court provides the final check on the constitutionality of a city's actions.

## CONCLUSION

We hold today that cities, acting pursuant to the authority provided by their city charters, may remove their magistrates for cause after a due process hearing. We therefore reverse the trial court's judgment that the amendment to article 6.1 of the Arizona Constitution divested the City Council of its authority to remove Jett from office.

As we have explained in the companion case of *In re Jett,* 180 Ariz. 103, 882 P.2d 414 (1994), Jett's misconduct warrants suspension for the remainder of her term in office, which would have expired April 7, 1997. Thus, her removal by the City Council was for cause. Our decision today makes clear, however, that Jett was entitled to a due process hearing before her removal by the City Council. Because the trial court did not resolve the issue of whether the June 28

---

5. We disagree with the dissent's conclusion that *Winter* referred to a due process hearing and removal *by this court,* rather than by a city council. Because *Winter* focused almost exclusively on a city council's authority with regard to city magistrates, we believe that the opinion impliedly acknowledged a city council's authority to remove a magistrate so long as a due process hearing is first provided. Moreover, because article 6.1, § 5 was amended for the specific purpose of bringing magistrates within the jurisdiction of the Commission, we do not agree that this

court had authority to remove magistrates from office at the time *Winter* was decided.

6. Under contemporary standards, a 4-year term seems appropriate. *See* Ariz. Const. art. 6, § 12 (4-year terms for superior court judges); A.R.S. § 22–102 (4-year terms for justices of the peace); Phoenix City Charter, ch. 8, § 3(a) (4-year terms for Phoenix city judges); Tucson City Charter, ch. 5, § 4.1 (4-year terms for Tucson city magistrates).

hearing comported with the requirements of due process, we do not address it.

FELDMAN, C.J., and MOELLER, V.C.J., concur.

MARTONE, Justice, dissenting.

I do not believe that our constitution allows the city council, the very entity that appointed this judge, to remove her from office for judicial misconduct. Indeed, under the constitution, only this court may remove or suspend this judge before her term expires. And we have done precisely that. See *In re Jett*, 180 Ariz. 103, 882 P.2d 414 (1994).

The court argues that by allowing the city to remove its magistrates from office, the magistrates are placed in "the same position as all other judges in the state." *Ante*, at 120, 882 P.2d at 431. But this is not the case. First, no other judge in the state is subject to removal by the very entity that appoints the judge. And city magistrates are the only judges who serve for specific terms subject to reappointment. Second, although the court correctly points out that all other judges holding elective office may be removed by various methods, these other methods are expressly provided by the constitution. Thus there is no separation of powers problem because the constitution itself provides for the methods of impeachment or recall. Moreover, neither impeachment nor recall are conducted by the institution that appoints the judge. In contrast to impeachment and recall, there is no provision in our constitution that empowers a city council to remove a judge. I believe, therefore, that the court's argument by analogy is without justification.

The court refers to the city charter as "itself of constitutional origin." *Ante*, at 121, 882 P.2d at 432. But the city charter is a document *authorized* by the constitution. It is not itself the constitution. Therefore, the charter provision must be tested against the constitution and our cases interpreting it.

The seminal case is *Winter v. Coor*, 144 Ariz. 56, 695 P.2d 1094 (1985). Even though no express contrary constitutional provision existed, we struck down a city code provision that allowed the city to remove town magistrates at will. We held that "the magistrate courts are indeed part of the integrated judicial department of this state." *Id.* at 59, 695 P.2d at 1097. We said that "[t]his view is reinforced by the necessity of judicial independence for all judges," *id.* at 60, 695 P.2d at 1098, and city magistrates are judicial officers, not "officers and agents of the town." *Id.* at 62, 695 P.2d at 1100. We specifically held that "service by a magistrate at the pleasure of an elected executive or legislative body does not constitute a 'term' for purposes of Article III and Article VI, § 32 of the Arizona Constitution." *Id.* at 63, 695 P.2d at 1101. Any term shorter than two years would compromise judicial independence and would not be constitutional. *Id.* at 64, 695 P.2d at 1102. We noted that a magistrate "may still be removed at any time for cause after a due process hearing." *Id.* We did not say, however, that the town council had authority to remove the judge and hold the hearing. That issue, of course, was not before the court.[1]

After *Winter*, the Arizona Constitution was amended to include magistrates under article 6.1, § 5. This expressly put due process hearings in the Commission on Judicial Conduct and removal power in this court.

The court argues that "when magistrates may be removed only for cause after a due process hearing, their judicial independence is adequately safeguarded." *Ante*, at 121, 882 P.2d at 432. But no one disputes that a magistrate can be removed after a due process hearing. The threat to judicial independence depends upon who does the removing. The city council is not a neutral body like the Commission on Judicial Conduct or this court. The city council is the entity that appointed the magistrate in the first instance, and it has the power to either reappoint or not reappoint at the conclusion of

---

1. Given the provisions of article 6, § 3, discussed *infra*, there is every reason to think that when this court in *Winter v. Coor* referred to a due process hearing and removal, it was referring to a hearing before this court and removal by this court, not by the City Council. Article 6.1, § 5 resolves any ambiguity that might exist under article 6, § 3 in favor of that interpretation. The hearing, wherever it was before, is now in the Commission.

the term. Vesting removal authority in an essentially political entity does not safeguard judicial independence. Indeed, our system nowhere vests the power to remove judges in the appointing body. Why would we do so here?

The court argues that by not allowing a city council to remove a judge, we would afford magistrates greater protection than article 3 affords to all other judges. *Ante*, at 123, 882 P.2d at 434. This is simply not the case. Indeed, by holding that the city council has the authority to remove a magistrate, we are affording magistrates *less* protection under article 3 than all other judges, for no other judge can be removed by the appointing authority. This is reason enough not to reach the court's result.

Nor is today's decision necessary. Recall that we can remove a judge under article 6.1 of the constitution, and the city council can always choose not to reappoint a judge for any legal reason. There are even further safeguards. Under article 6, § 3 of the constitution, "[t]he Supreme Court shall have administrative supervision over all the courts of the State." We have increasingly exercised our administrative supervision over limited jurisdiction judges. We have audited them, investigated them, and barred them from exercising judicial powers.

I am of the view that when the constitution provides this court with administrative supervision over all the courts of this state, it leaves no room for the city council to have administrative supervision over them. Unitary administrative supervision over all of the courts of this state is a critical element of what it means to have an integrated judicial department. Today the majority agrees with the city council. But what happens in a case in which there is disagreement? Suppose a city council removes a judge, but we believe a lesser sanction is appropriate. On judicial review of the removal proceeding, do we substitute our judgment for that of the city council as to what constitutes good cause? Do we substitute our judgment for that of the city council as to the propriety of a particular sanction? If unitary administrative supervision is to mean anything, we will

have to do so. But this would eviscerate the very power that the court now creates within the city council. This unsettling prospect is reason enough to find that the constitution contemplates a unitary power of removal and has vested it in this court.[2]

The court argues that by upholding the power of the city council, town magistrates are put on a par with superior court judges. But superior court judges are not answerable to, and cannot be removed by, a county board of supervisors. Indeed, just the thought of it is distasteful to judicial independence. How, then, can it be appropriate here? The court argues that its result is necessary, but the power of the city council to not reappoint, and the power of this court to remove as well as administer, leave no constitutional void to fill through necessity.

In defending the Constitution of the United States, its provision for independent Article III judges, and its rejection of periodic appointments, Alexander Hamilton said:

> If the power of making them [reappointments] was committed either to the executive or legislature there would be danger of an improper complaisance to the branch which possessed it; if to both, there would be an unwillingness to hazard the displeasure of either; if to the people, or to persons chosen by them for the special purpose, there would be too great a disposition to consult popularity to justify a reliance that nothing would be consulted but the Constitution and the laws.

The Federalist No. 78, at 471 (Alexander Hamilton) (Mentor ed., 1961). The need to be reappointed, which Hamilton condemned, already serves as a powerful engine of accountability for municipal court judges. To also allow the appointing authority to be the very body that can remove that judge fastens the lid on the coffin of judicial independence. I respectfully dissent.

ZLAKET, Justice.

I concur in Justice Martone's dissent.

---

**2.** Indeed, in the companion case of *In re Jett*, 180 Ariz. 103, 112, 882 P.2d 414, 423 (1994) the majority yields to the city council's sanction in order to avoid this very problem.