[L. A. No. 17132. In Bank.—September 20, 1939.]

TOM L. GLENN, Jr., Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Fred O. Reed for Petitioner.

Philbrick McCoy for Respondent.

THE COURT.—This is a proceeding to review the recommendation of the Board of Governors of The State Bar that petitioner be disbarred. The proceedings were heard before local administrative board No. 12 of The State Bar, for Los

Angeles County, on two notices to show cause charging him with professional misconduct with reference to the business entrusted to him by several of his clients. The notices to show cause charged petitioner with a violation of his oath and duty. as an attorney and counselor at law within the meaning of subdivision 2 of section 287 of the Code of Civil Procedure, and the commission of acts involving moral turpitude, dishonesty and corruption within the meaning of subdivision 5 of section 287 of the Code of Civil Procedure. After a rather extended hearing, the sessions of which were held intermittently and covered a period of several months, the local administrative committee made its findings by which they exonerated petitioner of certain of the charges preferred against him, found him guilty on the remaining charges, and recommended that he be suspended from practice for a period of two years. The Board of Bar Governors, on a review of the record, approved and adopted the findings of the local administrative committee but recommended that petitioner be disbarred.

██ After a careful reading of the record, we are of the opinion that petitioner, although perhaps a victim of unfortunate circumstances, was nevertheless guilty of conduct in relation to his clients which was censurable and warrants some disciplinary action. We do not believe, however, that his conduct with reference to the specific charges against him merits disbarment, and are satisfied that the recommendation of the local administrative committee that he be suspended from the practice of the law for a period of two years is a more fair and just penalty to be imposed.

As a preliminary to our discussion of the specific charges against petitioner, we may say that the seriousness of his offenses, and it·must be admitted that his conduct in several particulars was blameworthy, depends largely on the motives which actuated him. If he intentionally contracted to undertake certain legal work for his clients and accepted fees therefor with no intention of performing such services, he was obviously guilty of the most flagrant dishonesty. If through gross negligence, he failed to attend to the legal matters he had undertaken to handle, his conduct was inexcusable. If, however, as petitioner claims, during the period covered by the charges against him, he was under such a severe mental, physical, and financial strain, as to be unable to give his attention to his clients' business, such neglect,

although blameworthy, does not merit the same degree of censure as conduct motivated by deliberate dishonesty or wilful neglect.

In general the charges preferred against petitioner are that he accepted from several different clients fees ranging from $45 to $250, for which he rendered little, if any, service; that on several occasions he misinformed these clients as to the progress which had been made in their matters, that he used for his private purposes money which had been advanced by these clients to pay court costs; that on one occasion he failed to inform a client of an advantageous offer of settlement in order that he might be retained to handle further litigation in the matter, and that during the course of handling one matter, he had his client sign a blank form of verification to a complaint which had not then been drawn. Petitioner frankly admitted to the local administrative committee that he had received fees from clients for which he had rendered no service and admitted his obligation to reimburse them as soon as he was able. Petitioner, who is a young man with a wife and two small children, offers as an excuse for the situation in which he finds himself the fact that at the time in question he was in dire financial straits, that as a result he was unable to pay his office rent, and was evicted therefrom and his files retained by his landlord, that he was laboring under the mental stress occasioned by the preferring of a criminal charge against him for the issuance of a check without sufficient funds, given by him in connection with the lease on his home in Glendale, and that during a period of some days subsequent to his eviction from his office, he was ill with a streptococcus infection of his throat. There is no question that this is a true picture of petitioner's situation. The fact that he was evicted from his office for failure to pay his rent, and the fact that a criminal charge was pending against him from October 13, 1937, until January 29, 1938, when it was dismissed, is not denied. This being so, we are of the opinion that petitioner's explanation is genuine, and that his dereliction of duty grew out of his financial straits.

It will serve no good purpose in our opinion to go into the charges preferred against petitioner, setting forth in detail the conflict in evidence relative to each particular charge, or the different inferences which might possibly be drawn

from the same evidence. There were seven charges preferred against petitioner. We shall discuss these charges in the same order in which they are discussed in the brief filed by the attorney for The State Bar.

### The Tassio Matter.

In June, 1937, one Ralph Tassio, a licensed contractor, had a dispute with one Berthold, a subcontractor. The matter was discussed with a Mr. Lawson, inspector of contractors, and Tassio gave Lawson a check payable to petitioner in the sum of $31.25. Petitioner was not the attorney for either Tassio or Berthold, but it appears that he had been the attorney for Lawson, and had theretofore performed certain services for him for which he had not yet been paid. The check was left at the office of petitioner by Lawson. Petitioner cashed it and used the proceeds. Thereafter he learned what the check was for, and that he was only intended to be the stakeholder. Thereafter petitioner gave Tassio his check for $31.25 which Tassio endorsed and gave to Berthold but which was dishonored by the bank. Tassio talked the matter over with a Mr. Butler, an attorney, who came over to see a friend of Mr. Tassio and who offered to take the matter up with The State Bar for him. Two days thereafter Tassio called petitioner on the phone with reference to the check and petitioner went over to Tassio's house and paid him the $31.25 in cash. It will be noted, that the substance of this complaint is that petitioner, having cashed Tassio's check, probably through inadvertence, thereafter failed to reimburse him for several months. According to petitioner's explanation he was without any means to refund said sum. The failure cannot be correctly characterized in our opinion as wilful misappropriation of said money.

### The Corazzo-Buchanan Matter.

In November, 1937, Corazzo and Buchanan employed petitioner to collect their claim of $747 from one Susan Underwood, paying him a fee of $25 as a retainer. Petitioner was unable to secure a settlement, and advised Corazzo and Buchanan that it would be necessary to file an action against Mrs. Underwood. He advised them that his fee would be $50, which they agreed to pay, $25 at the time, and $25 when the case came on for trial. On December 15, 1937, Buchanan gave petitioner a check for $45 which included,

according to his testimony, $25 on account of attorney's fees, and $20 for court costs. At the time, petitioner had Corazzo sign a blank form of verification for the complaint which had not yet been prepared. That day or the next day, petitioner was locked out of his office. Thereafter Corazzo and Buchanan vainly attempted to contact him but were unable to do so. They finally got in touch with him at the court-house, and he promised them he would go ahead with their matter as soon as possible. Petitioner admits that he never did prepare or file a complaint, and that he owes these clients the $45 which they paid to him. He explains his neglect in this matter by the fact that immediately after receiving his fee, he was locked out of his office, and by the fact that he was postponing the matter until after the criminal charge pending against him had terminated. We do not find that there was on the part of the petitioner any actual intent to defraud his clients. With reference to the fact that he had his client sign a blank form of verification, this prac-tice, although improperly indulged in by some attorneys, is one which is highly reprehensible, and in our opinion, should be most severely condemned.

## The Lund Matter.

During the fall of 1937, petitioner had handled the matter of paying off certain mechanics' liens for Mrs. Margaret Lund. Although Mrs. Lund complained before The State Bar that he had failed to file the releases which he had received, the local administrative committee found that the money paid by Mrs. Lund to petitioner was not intended to cover the cost of filing these releases. In August, 1937, Mr. T. W. Patrick, the contractor who had built her house, filed a suit for a foreclosure of a mechanic's lien against Mrs. Lund, but did not serve the summons and complaint at that time. Mrs. Lund paid petitioner $150 in full payment for his services to be rendered in defending the action for her. The local administrative committee found that said sum was not intended to include costs. Petitioner assured Mrs. Lund that she need not worry about being served and the various court proceedings as he would take care of all of them for her. She testified before the local administrative committee that he had informed her that he had filed a demurrer, and later informed her that the demurrer had been overruled. Mrs. Lund was served with summons on December 29, 1937,

and upon telephoning to the clerk's office, found that no demurrer had been filed and no answer had been filed. Thereafter, and two days before the expiration of the time allowed to answer, Mrs. Lund employed other counsel who handled the matter for her. Petitioner denied that he had received the registered letter from Mrs. Lund demanding the return of her files and the fee of $150, but after Mrs. Lund had made complaint to The State Bar, he turned over the files to her new attorney, and stated that he was willing to make a refund of the fee paid to him "as he had been paid for work he didn't complete". In addition to the charges made, with reference to this particular client, of his accepting a fee for services which were not performed, and misinforming his client as to matters pertaining to the progress of her action, a finding was made by the local administrative committee that he had failed to inform his client, Mrs. Lund, of an offer made by T. W. Patrick, to accept the sum of $200 in full settlement of the controversy existing between him and Mrs. Lund. The committee further found "that respondent failed to advise Mrs. Lund of the proposed settlement . . . for the purpose and in the hope that thereby respondent might be able to have and use said $150 paid to him as attorney's fees". This failure to inform his client of an advantageous offer for his own private gain, if true, is one of the most serious charges preferred against petitioner, as it indicates a deliberate intent to take advantage of a client. There is a direct conflict of evidence in this regard between the testimony of Mrs. Lund and petitioner. Mrs. Lund testified that petitioner had never informed her of the proposed settlement. Petitioner testified that he had informed her of the proposed offer, but inasmuch as she had a claim against Patrick based upon damages as a result of Mr. Patrick's failure to complete the job and loss of rental during that period of time, she had said, "Why should I pay Mr. Patrick anything, he owes me money." The local administrative committee accepted as true the testimony of Mrs. Lund, and we cannot, of course, say that it was not justified in so doing. However, petitioner points out that the question with reference to the proposed settlement was first brought into the investigation by a volunteer statement of petitioner, himself, during the discussion of the $150 from Mrs. Lund, to the effect that at or about the time he received the check, a proposal to settle the entire controversy for the

sum of $200 had been made by Mr. Patrick, of which offer he had informed Mrs. Lund. Mrs. Lund had not apparently learned of this proposal of settlement from Mr. Patrick or any other outside source as it was not set forth in the order to show cause served on petitioner. On the other hand, if petitioner had refrained from furnishing his client with information as to this proposed settlement for purposes to his own advantage, it is unreasonable to suppose he would have brought the matter up before the investigating committee.

There can, of course, be no denial of the fact that petitioner neglected his client's business and that his neglect to properly handle the matter is highly censurable. Besides the annoyance and worry which he caused his client by this neglect of her business, she was compelled to employ and pay other counsel to act for her, and the fact that she was able to make an appearance in the case against her before any default was taken while fortunate for her was not anything for which petitioner could claim credit. It is useless, however, to conjecture whether petitioner would have been so derelict in his duty as to permit judgment to go against his client by default. Any such conclusion could never amount to more than a mere surmise. But whatever may be the explanation for his neglect, the fact should be emphasized that no amount of personal difficulties could in fact justify such neglect.

## The Isett Matter.

Prior to July, 1936, G. W. Isett had filed an action in the superior court for the county of Los Angeles against one Frees for alleged malpractice. Isett, in the latter part of 1936 employed petitioner to represent him, and petitioner was substituted as his attorney in that case. At the time of taking the case it was agreed that it should be handled on a contingent fee basis of 50 per cent of any amount recovered and that petitioner would pay the cost of litigation. In the spring of 1937, petitioner informed Isett that he could not provide the money for costs, that there would be considerable preliminary work to be done in preparation of the trial, and the costs would amount to about $300. It was then agreed between them that Isett would advance money for costs, and petitioner would handle it on a contingent fee basis of 35 per cent. Isett paid petitioner $100 on June 1, 1937, and the remaining $200 was paid during the course of the trial. The case after a three days' trial resulted in a non-

suit. The gist of this charge against petitioner is that there was no authorization from Isett to spend the money furnished by him for certain items in the preparation of the case and that petitioner expended a portion of said money in payment of certain expenses which he should have paid himself, such as the payment of another attorney to do research in the law for him, the payment for stenographic services and an extra girl whom he called in to type instructions, as well as certain other items. Petitioner testified that he did not keep a system of books but put a memorandum of all items with the case in the files. Upon request from Isett, he furnished him with an itemized account of the money paid out by him. This itemized account was furnished by petitioner at the time of the preliminary hearing of the charges made against him by Isett. It is quite evident that the itemized statement contains items which are usually borne in contingent fee cases by the attorney handling the case, and it is possible that Isett did not specially authorize the particular items. But in view of the exigencies of petitioner's financial situation, of which Isett must have been aware since petitioner informed him that he did not have money to provide for the costs of preparing for trial and changed his contract with Isett for that reason, it does not seem unreasonable to us that petitioner honestly felt that he was justified in charging the entire cost of the trial and its preparation to Isett. The fact that petitioner included the items which were questioned in the account furnished to Isett at the preliminary hearing of the investigation against him, would seem to indicate good faith on his part. The local administrative committee found that $197 had properly been expended by petitioner, and also that the portion of the sum of $82.26 paid by petitioner which might properly be allocated to the investigation of witnesses, was properly paid by respondent. We are of the opinion, from a perusal of the itemized account, that possibly $50 of the amount paid to Boland was paid for investigation and therefore properly paid. It is also apparent from the record that petitioner had personally obligated himself to pay Dr. Gassman $50 as expert witness's fee. It seems a fair conclusion, therefore, that the amount properly chargeable against said fund by petitioner is approximately $300 and that if he personally pays Dr. Gassman, he will have properly accounted for the entire amount of money advanced by Isett.

There was a finding to the effect that an item of $4.20 included under one heading in the account, was also included in the other two items totaling $9.25. Petitioner at the hearing admitted that this might be possible due to the fact that he had made up the account from his own recollection aided solely by the memoranda in the file.

Complaint was also made with reference to the Isett matter that petitioner had advised Isett that he would take an appeal. It is admitted that Isett was told by petitioner that a transcript of evidence would cost $180, but petitioner never told Isett that the $300 had been entirely expended, and that Isett would need to furnish an additional $180 for the appeal. Isett secured another attorney to handle the matter for him. Petitioner's conduct in failing to advise his client that he was financially unable to take the appeal, and his leading his client to believe that the matter was being properly taken care of when it was not, cannot be condoned.

### The Gassman Matter.

Petitioner gave to Dr. Gassman, as an expert witness in the Isett matter, his check for $50 which was refused payment by the bank. Petitioner admits his liability to Dr. Gassman on this obligation, and has stated that he will pay him as soon as he is able. Petitioner's financial straits were undoubtedly responsible for his transgression in this instance.

### The Osborne Matter.

The notices to show cause charge petitioner with professional misconduct in respect to four matters in which he was employed by one Lewis W. Osborne. The local administrative committee expressly found that he was not negligent with reference to three of these matters. With reference to the matter of the foreclosure of a deed of trust of one Di Maria, the committee found that petitioner had accepted a fee of $250, to foreclose said deed of trust and had not consummated said work. It appears that when Osborne was unable to locate the petitioner by reason of the fact that petitioner's office had been closed, Osborne got in touch with another attorney, who contacted petitioner, and after giving petitioner ten days in which to take care of the matter, took over the matter himself. The finding of the committee is that petitioner "has not completed the services for which he was paid $250 by Osborne". The attorney who took the matter over testified that in his conversation with petitioner,

petitioner had informed him that he had already filed a *lis pendens* when in fact no complaint had been filed. It appears that petitioner had received $250 for services which he has not rendered, and which he is in good conscience obligated to return to his client.

### The Lowery Matter.

Petitioner in 1937 had represented one R. J. Lowery in certain criminal cases in the city of Bell, near Los Angeles. These services were, according to petitioner, worth $150. Prior to his representation of Lowery in the criminal cases, Lowery had sought to employ petitioner to secure the removal of one Leona Stiler as the guardian of Mrs. Lowery, who had been adjudged incompetent. In a conversation with Mr. Lowery, and one Mike Senko, a relative of Mrs. Lowery, Senko offered to furnish $100 of the $250 fee asked by petitioner, and paid petitioner $20 at the time, and later sent him a cashier's check for $80. Petitioner, in addition to representing Lowery upon the criminal charges, also argued the motion for a new trial in the case of *Lowery* v. *Lowery*, but took no action whatever with reference to the removal of the guardian. The committee found itself unable to decide whether the $100 paid by Senko was intended as payment or part payment for services rendered in the past, or whether said $100 or any part thereof was intended to be in payment of a portion of the fee for services to be rendered in the removal proceeding. They did find that petitioner had promised to proceed to take some action looking toward the removal of the guardian, and he had failed to take any whatever. It is apparent that in this particular also, petitioner was remiss in his duty.

As stated before, a reading of the record does not convince us that petitioner was wilfully dishonest nor deliberately neglectful of his clients' business, but that his dereliction of duty in the main grew out of his financial embarrassment. While this fact does not, of course, justify his conduct or absolve him from wrongdoing, it does in a measure lessen to at least a slight degree its blameworthiness. We are well aware that the protection of the public requires that the rules of professional conduct be adhered to, and we also believe that the ethical standards of the legal profession demand the ostracism from its ranks of any member who has proven himself unworthy to be a member. We are also of the opin-

ion that an attorney's personal misfortunes and private embarrassments, however serious, cannot be accepted as extenuating circumstances to the extent of absolving him from discipline.

We do not believe that petitioner should escape all disciplinary action, but we do feel that in the instant case disbarment is too severe a penalty and that a two years' suspension from the practice of the law is sufficient. In the case of *Wilcox* v. *State Bar*, 2 Cal. (2d) 614 [42 Pac. (2d) 631], in an opinion written by Mr. Justice Seawell, it is said, "The disbarment of an attorney, which means a denial of his right to practice law in this state is a grave matter, as it places an indelible stain upon the name of the disbarred lawyer which affects him generally as a citizen. Once disbarred, experience teaches us that the barrier which is thereby raised becomes almost insuperable to reinstatement. Therefore, the court should and does exercise much care in making an order of disbarment."

We are, however, firmly convinced that petitioner's clients, from whom he accepted fees without rendering services, had just and serious cause for complaint. The fact that petitioner himself has recognized that fact, and in his final brief has offered to reimburse his clients, is a hopeful sign of his rehabilitation. This offer, we are persuaded, was made in good faith by petitioner and will be carried out by him.

It is ordered that thirty days after the filing of this opinion, petitioner be suspended from the practice of law in this state for a period of two years.