882 P.2d 414

**In re Rita JETT, a judge of the City of Tucson, Municipal Court, Respondent.**

No. JC–94–0001.

Supreme Court of Arizona, En Banc.

Sept. 29, 1994.

Harriet L. Turney, Chief Counsel, Phoenix, for State Bar of Arizona.

E. Keith Stott, Jr., Executive Director, Phoenix, for Commission on Judicial Conduct.

O'Dowd, Burke & Lundquist, P.C. by Bruce A. Burke, Tucson, for respondent.

## OPINION

CORCORAN, Justice.

### STATEMENT OF THE CASE

The Commission on Judicial Conduct (Commission) found that Respondent, Rita Jett, a Tucson city magistrate, violated Canons 1, 2(A), 2(B), and 3(E) of the Code of Judicial Conduct; rule 81, Arizona Rules of the Supreme Court; and Ariz. Const. Art. 6.1, § 4. Accordingly, the Commission recommends that this court publicly censure and suspend Respondent, without pay, for a period of 60 days. The Commission also recommends that we require Respondent to continue her counseling program until her psychologist determines that counseling is no longer required, and that we require Respondent to attend, participate in, and complete a counseling program for victims of domestic violence, as recommended by her psychologist. We have jurisdiction pursuant to Ariz. Const. Art. 6.1, § 4.

### FACTS AND PROCEDURAL HISTORY

The facts in this case, as found by the Commission, are undisputed. Respondent has served as a city magistrate in Tucson for more than 8 years. During the early morning hours of Saturday, June 12, 1993, Respondent's intoxicated, live-in boyfriend, Ben Andrews, woke Respondent from her sleep

and subjected her to several hours of verbal abuse. After Andrews refused to leave Respondent's house, she called the police. Upon their arrival, the police arrested Andrews on suspicion of domestic violence, criminal trespass, and disorderly conduct. Andrews was detained in the Pima County Jail where his case was assigned to pretrial services for release assessment. Later that morning, Respondent went to the jail and instructed the pretrial services staff to prepare a release order containing conditions of release for Andrews. Respondent signed the release order in her capacity as a judge, and Andrews was released, without bond, on his signature, several hours before the scheduled arraignment time.

On Monday, June 14, Respondent reported her conduct to the presiding magistrate of the Tucson Municipal Court, the chairman of the Commission on Judicial Conduct, and the presiding judge of the Pima County Superior Court. Respondent admitted to each that she had committed an egregious error in judgment that caused a loss of public confidence in the judiciary.

This incident triggered two different proceedings: (1) a hearing before the Tucson City Council, which resulted in the removal of Respondent from her office of Tucson City Magistrate and which is the subject of appeal in the companion case, *Jett v. City of Tucson*, 180 Ariz. 115, 882 P.2d 426 (1994); and (2) the disciplinary action that is the subject of this appeal.

After being removed from office, Respondent sued the City and the City Council members seeking reinstatement, damages, and reasonable attorney's fees and costs. Respondent argued that the City Council did not have the authority to remove her from office. The parties filed cross-motions for summary judgment, after which the trial court granted Respondent's motion, finding that the Arizona Constitution granted the Commission exclusive jurisdiction over the removal of a city magistrate. The City appealed. Because the issue raised in the appeal related directly to a pending proceeding before the Commission, which this court would ultimately consider, the court of appeals petitioned to transfer the case to this court pursuant to rule 19(a)(3), Arizona Rules of Civil Appellate Procedure. We granted the petition to transfer.

At the same time Respondent was pursuing her action against the City, the Commission was investigating Respondent's conduct. As a result of the June 12 incident, the Commission instituted formal proceedings against Respondent. After a public hearing, the Commission issued its Findings of Fact, Conclusions of Law, and Recommendations, which were later amended. Respondent waived her right to: object to the Commission's findings, conclusions, and recommendations; file a petition to modify or reject the Commission's recommendations; and request oral argument. Thus, the matter was deemed submitted to this court. Rule 11(b), Arizona Rules of Procedure for the Commission on Judicial Conduct.

For purposes of oral argument only, we consolidated the action concerning Respondent's removal by the City Council and the disciplinary action before the Commission. The court heard oral argument on March 2, 1994. And, although this disciplinary matter was deemed submitted to the court, we allowed Respondent to argue what sanction was appropriate in light of her misconduct.

## DISCUSSION

1. *Standard of Review*

   ▮▮▮▮ Our constitution grants the Commission on Judicial Conduct the power to recommend to this court the disposition to be made in each case of judicial discipline, and we give serious consideration to the Commission's findings. *In re Haddad*, 128 Ariz. 490, 491, 627 P.2d 221, 222 (1981). The ultimate authority to impose discipline on a member of the judiciary, however, rests with this court. *See* Ariz. Const. art. 6.1, §§ 3 and 4; *see also Haddad*, 128 Ariz. at 491, 627 P.2d at 222 (the burden of imposing the sanction is put squarely on the Supreme Court; the Commission has power only to recommend) (citations omitted). Thus, in judicial disciplinary matters, we independently review the Commission's record because we are the ultimate trier of fact and law. *In re Lockwood*, 167 Ariz. 9, 11, 804 P.2d 738, 740 (1990).

## 2. *Respondent's Violations*

Although we accept the Commission's findings of fact in this case, we partially reject the Commission's conclusions of law. The Commission concluded that:

> Respondent's actions in signing an order that resulted in the release from jail of a person with whom she had a personal and intimate relationship, prior to his scheduled arraignment, ... was ethically improper because she showed favoritism and gave deferential treatment to a person with whom she had a close relationship and who was in a position to influence her conduct or judgment....

Thus, the Commission found that Respondent violated Canons 1, 2(A), 2(B), and 3(E) of the Code of Judicial Conduct, rule 81, Arizona Rules of the Supreme Court. With this much, we agree.[1]

■ Our disagreement with the Commission rests with its determination that Respondent's conduct was not willful misconduct, but rather was conduct prejudicial to the administration of justice that brought her judicial office into disrepute. The Commission's conclusion was based on this court's decision in *Haddad,* in which we defined willful misconduct as "unjudicial conduct which a judge acting in his judicial capacity commits in bad faith." 128 Ariz. at 497, 627 P.2d at 228. Because the Commission found that Respondent was suffering from "battered woman syndrome" and sleep deprivation when she ordered her boyfriend released from jail, it concluded that "Respondent did not have the requisite state of mind that would permit a finding of bad faith" necessary to find that she engaged in willful misconduct. Although we concede that Respondent was suffering from "battered woman syndrome" and sleep deprivation when she ordered her boyfriend released from jail, we disagree with the Commission's conclusion for two reasons.

■ First, we disagree with the Commission's use of Respondent's mental state to support a finding of conduct prejudicial to the administration of justice, which is a less serious violation than willful misconduct. Although this court has not addressed the effect of a mental condition on the determination of judicial misconduct, we have addressed the issue in the context of lawyer misconduct. *See In re Hoover I,* 155 Ariz. 192, 198–99, 745 P.2d 939, 945–46 (1987). In *Hoover I,* we adopted the reasoning of *In re Stout,* 122 Ariz. 503, 596 P.2d 29 (1979) which held that:

> [T]his court's primary obligation in administering bar discipline is protecting the public *rather than analyzing the reasons for the lawyer's delinquency.* "Our primary concern must be the fulfillment of proper professional standards, whatever the unfortunate cause, emotional or otherwise, for the attorney's failure to do so." [Citations omitted.] An attorney cannot escape bar discipline by urging his misconduct was the result of a mental condition.

155 Ariz. at 198, 745 P.2d at 945 (emphasis added). Thus in lawyer disciplinary actions, the nature of a lawyer's misconduct does not change merely because the misconduct was the result of a mental condition. We hold that the same is true in judicial disciplinary cases. The nature of a judge's misconduct does not change merely because the misconduct was the result of a mental condition, and a judge cannot escape discipline by urging that her misconduct was the result of such a condition.

■ Second, the Commission appears to have interpreted the "bad faith" requirement as requiring an intent to violate the Canons of Judicial Conduct. In *Haddad,* this court adopted the standards used by the California Supreme Court to distinguish "willful conduct" from conduct that is "prejudicial to the administration of justice that brings the judicial office into disrepute." *See Haddad,* 128 Ariz. at 497–98, 627 P.2d at 228–29, citing *Geiler v. Commission on Judicial Qualifications,* 10 Cal.3d 270, 110 Cal.Rptr. 201, 515 P.2d 1, 9 (1973). There we agreed with the California Supreme Court that:

---

1. Respondent admitted her actions violated these particular Canons in her Answer to the Commission's Statement of Charges.

The more serious charge [willful misconduct] should be reserved for unjudicial conduct which a judge acting in his judicial capacity commits in bad faith, while the lesser charge [conduct prejudicial to the administration of justice that brings the judicial office into disrepute] should be applied to conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office.

*Haddad,* 128 Ariz. at 497–98, 627 P.2d at 228–29. Thus, under this rule, the less serious charge of conduct prejudicial to the administration of justice applies only to judicial acts undertaken in good faith.[2] *Haddad,* 128 Ariz. at 497–98, 627 P.2d at 228–29 (citations omitted).

This court has not defined the terms "bad faith" and "good faith" in the context of judicial misconduct. We approve, however, of the distinction recognized by the California Supreme Court, from which we initially adopted the bad faith/good faith distinction.

▪▪▪▪ "[B]ad faith is quintessentially a concept of specific intent requiring consciousness of purpose as an antecedent to a judge's acting maliciously or corruptly." *Spruance v. Commission on Judicial Qualifications,* 13 Cal.3d 778, 119 Cal.Rptr. 841, 532 P.2d 1209, 1221 (1975). Essentially two types of judicial acts fall within the scope of bad faith: (1) "intentionally committed acts which [the judge] knew or should have known were beyond [the judge's] lawful power" and that involve "actual malice as the motivation for a judge's acting ultra vires"; and (2) intentionally committed "acts within the lawful power of a judge which nevertheless are committed for a corrupt purpose, i.e., *for any purpose other than the faithful discharge of judicial duties.*" *Spruance,* 119 Cal.Rptr. at 853, 532 P.2d at 1221 (citations omitted) (emphasis added); *see also In re Hendrix,* 145 Ariz. 345, 347, 701 P.2d 841, 843 (1985) (willful

misconduct in office "implies or requires actions taken in bad faith, contrary to law or in conscious excess of jurisdiction, or for a corrupt or improper motive."). "The lesser included charge of conduct prejudicial [to the administration of justice] connotes 'conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office' as well as wilful misconduct out of office, . . . ." *Gonzalez v. Commission on Judicial Performance,* 33 Cal.3d 359, 188 Cal.Rptr. 880, 657 P.2d 372, 373–74 (1983), quoting *Geiler,* 110 Cal.Rptr. at 209, n. 11, 515 P.2d at 9, n. 11.

In this case, Respondent was acting within her lawful power when she released her boyfriend from jail. We find no evidence, however, that suggests Respondent was acting in "good faith," under any definition of "good faith," when she did so. Respondent admitted that John Coleman from Pretrial Release Services phoned her because she was the victim of a crime. She stated that after receiving the call, she "decided to go down to the jail and get [her boyfriend] out of jail since I had put him there." She testified that she drove down to the jail and talked to John Coleman who gave her various forms to sign. She stated that she signed the forms where it said magistrate or judge. Respondent clearly used the lawful power of her office for purely personal reasons. And using her office for any purpose other than the faithful discharge of her judicial duties constitutes a corrupt purpose. *See Spruance,* 119 Cal.Rptr. at 853, 532 P.2d at 1221. Accordingly, we find that Respondent's conduct was committed in bad faith, and thus, the more serious charge of willful misconduct applies.

### 3. Sanctions

Having found that Respondent violated Canons 1, 2(A), 2(B), and 3(E), and that her actions constituted willful misconduct and conduct prejudicial to the administration of

---

**2.** "It should be emphasized that our characterization of one ground for imposing discipline as more or less serious than the other does not imply that in a given case we would regard the ultimate sanction of removal as unjustified solely for 'conduct prejudicial to the administration of justice which brings the judicial office into disrepute.' " *Geiler,* 110 Cal.Rptr. at 209 n. 11, 515 P.2d at 9 n. 11.

justice that brought her judicial office into disrepute, we must now decide the appropriate sanction. The Commission recommends that we publicly censure Respondent and suspend her for 60 days, based on its finding that Respondent's actions constituted conduct prejudicial to the administration of justice. Although ordinarily we give great deference to the Commission's recommendations, the ultimate authority to determine proper sanctions rests with this court. *See In re Peck,* 177 Ariz. 283, 290, 867 P.2d 853, 860 (1994) (citations omitted). In this case, we reject the Commission's recommendations because we find that Respondent's conduct was willful misconduct, rather than conduct that was merely prejudicial to the administration of justice.[3]

In determining the appropriate sanction, we are guided by the principle that the goal of judicial discipline is not to punish, but rather to protect the public interest by policing the profession and maintaining confidence in the judicial system. *See Haddad,* 128 Ariz. at 492, 627 P.2d at 223. Thus, we begin by examining Respondent's conduct in light of its harm to the public and its impact on the perceived integrity of the judicial system.

### a. Harm Caused

In this particular instance, Respondent Jett used her official position to get her boyfriend released from jail. In an attempt to minimize the impact of her actions to the City Council, she offered evidence that her actions resulted in her boyfriend being released only 3 or 4 hours earlier than he would have otherwise been released. Respondent misses the point: using the power of her judicial office for purely personal reasons is grossly improper. Such misuse of public office destroys public confidence in the integrity and impartiality of the judiciary, and shows that Respondent's personal relationships have influenced her judicial conduct.

### b. Aggravating and Mitigating Considerations

Having found Respondent's conduct to be a serious violation of the Code of Judicial Conduct, we consider any additional factors indicating that the public and the judiciary either do or do not need protection from Respondent. *See Peck,* 177 Ariz. at 289–90, 867 P.2d at 859–60 (discussing aggravating factors that indicated public and judiciary needed protection from Peck). Relevant factors include, but are not limited to: (1) prior disciplinary record, (2) acknowledgment of the misconduct, (3) rehabilitative efforts, and (4) length of service on the bench. *See In re Deming,* 108 Wash.2d 82, 736 P.2d 639, 659 *amended by* 744 P.2d 340 (1987). Additionally, in fashioning an appropriate sanction, this court may properly consider any factor that indicates that the public will be better served by retaining rather than suspending or removing a judge. *See McCartney v. Commission on Judicial Qualifications,* 12 Cal.3d 512, 116 Cal.Rptr. 260, 526 P.2d 268, 288 (1974) (court considered in mitigation judge's "commitment to fairness and innovative procedural reform"), *overruled on other grounds by Spruance v. Commission on Judicial Qualifications,* 13 Cal.3d 778, 119 Cal.Rptr. 841, 532 P.2d 1209 (1975); *In re Gumaer,* 177 Ariz. 280, 282–83, 867 P.2d 850, 852–53 (1994) (court considered in mitigation judge's demonstrated ability to fairly, effectively and efficiently run his justice court, which had one of heaviest caseloads in state); *cf. In re Riley,* 142 Ariz. 604, 615, 691 P.2d 695, 706 (1984) (despite concluding that 30–day suspension from practice of law was warranted, court censured attorney, who was at that time one of three superior court judges in Cochise County, to avoid unnecessarily disrupting judiciary).

In this case, we find Respondent's prior disciplinary record highly instructive on the public's need for protection from Respondent. This is not the first time that Respondent has run afoul of the Code of Judicial Conduct; she has been informally disciplined

---

**3.** In its findings, the Commission implied that it would have imposed a much more severe penalty had it concluded that Respondent was "guilty of willful misconduct in office." The Commission stated that: "without the requisite intent, the Respondent's actions do not require the most severe penalty under the constitution."

for misconduct in 4 separate incidents.[4] The last 2 incidents occurred within 6 months of the incident giving rise to this disciplinary action. We find that Respondent's pattern of misconduct presents a threat to the public, and therefore we consider it to be a strong aggravating factor. *Cf. In re Peck*, 177 Ariz. at 289, 867 P.2d at 859.

▪ We recognize that in an earlier judicial disciplinary case, this court refused to consider informal disciplinary sanctions because the earlier proceeding did not involve conduct related to the charge then under investigation. *See In re Ackel*, 155 Ariz. 34, 41, 745 P.2d 92, 99 (1987). In *Ackel*, the majority discounted the seriousness of the complaints, stating that if the conduct had been truly serious, the Commission "should have recommended censure or removal rather than merely leaving the file open or admonishing [the judge]." *Ackel*, 155 Ariz. at 41, 745 P.2d at 99. We, along with other courts that have addressed this issue, have since recognized that "an accumulation of small and ostensibly innocuous incidents," when taken together can indicate "a pattern of hostile conduct unbecoming a member of the judiciary." *Deming*, 736 P.2d at 658 (citations omitted); *cf. In re Peck*, 177 Ariz. at 290–91, 867 P.2d at 860–61. Thus, this court will consider prior disciplinary sanctions, formal or informal, in determining the appropriate sanction to be imposed in a judicial disciplinary action. And, insofar as *Ackel* suggests that the court will not consider informal sanctions imposed in prior judicial disciplinary actions, it is hereby overruled.

Despite recognizing that she committed a serious act of misconduct, Respondent argues that a short-term suspension is the appropriate sanction for this case. In support of her claim, Respondent notes that her misconduct was a single incident of misconduct directly attributable to her impaired state. Respondent claims that, because of her state of mind, "she did not consciously willfully perform the acts that she did in bad faith." Moreover, Respondent points to her immediate acknowledgment of her wrongdoing, her cooperation with the Commission, her remorse over her actions, the rehabilitative psychological counseling that she has undertaken, and her willingness to continue such counseling under the conditions that the Commission deemed appropriate.

We agree with the Commission's finding that Respondent was remorseful, readily acknowledged her transgressions, and was cooperative with the Commission's hearing. But, in light of her past disciplinary record,

---

4. In case No. 91–CJC–068, which was decided in August 1991, the Commission reprimanded Respondent for violating Canons 1, 2(A), 2(B), and 3(B)(6) of the Code of Judicial Conduct. This violation concerns Respondent's involvement with members of a local homeowners' association, a Tucson city councilman, Tucson city prosecutors, and another Tucson city magistrate in an effort to address the problem of prostitutes in a local neighborhood.

The Commission concluded that Respondent's involvement with these activities brought into question the court's relationship with the city council and made it appear that the court had entered into a joint venture with law enforcement and prosecutors. This, the Commission concluded, "created an impression that members of the homeowners' association and prosecutors were in a special position to influence the court and that the court was biased."

In case 92–CJC–066, which was decided in September 1992, the Commission admonished Respondent for holding an *ex parte* communication with a city prosecutor in violation of Canon 3(B)(4) of the Code of Judicial Conduct. Because of this *ex parte* communication, a mistrial was declared. Although the Commission acknowledged that the mistrial occurred primarily because of prosecutorial misconduct, the record is clear that had Respondent not held the communication *ex parte*, the prosecutor's misconduct would likely have been discovered and the mistrial avoided.

In case 93–CJC–028, which was decided in July 1993, Respondent was disciplined for two separate incidents of misconduct. Count 1 involved Respondent's handling of a traffic violation, during which Respondent became impatient and upset with the pro per defendant. The Commission admonished Respondent for her misconduct in Count I, finding that her conduct violated Canon 3(B)(3) of the Code of Judicial Conduct, which requires a judge to be patient and courteous at all times.

Count 2 involved Respondent's handling of a civil domestic violence proceeding in which she both failed to allow one of the parties a full opportunity to be heard and participated in *ex parte* communications with law enforcement officials. The Commission reprimanded Respondent for her misconduct in Count II, finding that her conduct violated Canon 3(B)(4) of the Code of Judicial Conduct, which prohibits *ex parte* communications.

these factors carry little weight in terms of mitigation. In all 4 prior disciplinary actions, Respondent acknowledged that her conduct violated various Canons of the Code of Judicial Conduct. In all 4 prior disciplinary instances, she cooperated with the Commission. In all 4 prior disciplinary instances, she appeared remorseful. After repeated violations, however, these factors lose their impact. We cannot continue to excuse judicial misconduct because the judge repeatedly acknowledges wrongdoing, cooperates with the disciplinary process, and is remorseful.

■ Respondent argues that her "mental impairment" reduces the seriousness of her misconduct, and thus calls for a lesser sanction. We appreciate that Respondent's misconduct was attributable to her being deprived of sleep and her suffering from "battered woman syndrome." As we explained earlier, however, Respondent's use of her public office to pursue personal aims, regardless of the reasons, still constitutes willful misconduct. Although misconduct committed as a result of a judge's impaired mental state will not preclude a finding of willful misconduct, we will consider the condition in determining whether and what kind of discipline is to be imposed and what procedures are to be followed to protect the public. *Cf. Hoover I,* 155 Ariz. at 199, 745 P.2d at 946.

### c. Disposition

We do not lightly deviate from the Commission's recommendations. We agree with the dissent that we should give serious consideration to the recommendations of the Commission. We do and we have in this case. However, the responsibility for determining the appropriate sanction is ours alone. Particularly given the fact that we have concluded that the Commission applied an improper legal standard, we are in this case unable to follow the Commission's recommendation as the dissenting justice would do.

Despite the dissent's statements to the contrary, there is nothing improper or even unusual about the court varying from the Commission's recommendations. In several recent cases, we have unanimously determined that the recommended sanction was inappropriate. In the recent *Peck* case, the Commission recommended a 30-day suspension. This court unanimously removed Judge Peck. *In re Peck,* 177 Ariz. at 290–91, 867 P.2d at 860–61. In the recent *Lorona* case, the Commission recommended a 15-day suspension. This court, with four justices sitting, unanimously suspended Judge Lorona for 90 days. *In re Lorona,* 178 Ariz. 562, 570, 875 P.2d 795, 803 (1994). In the *Goodfarb* case, the Commission recommended a 3-month suspension. This court, however, unanimously imposed a longer suspension, suspending Judge Goodfarb for the entire balance of his term. *In re Goodfarb,* 179 Ariz. 400, 403, 880 P.2d 620, 623 (1994).

This case presents a tough decision for the court. This court is responsible for protecting the public from those who are unfit to serve. We believe that Arizona is entitled to the best possible judges it can get and keep, and that the public should and does demand and expect much of their judges in view of the vast power granted to them. Respondent's repeated violations of the Code of Judicial Conduct demonstrate that she is unfit for judicial service at this time. Lawyers, litigants, witnesses, jurors, and the general public are entitled to courts staffed by competent judges who have not repeatedly violated the canons set forth in the Code of Judicial Conduct. *In re Jordon,* 290 Or. 303, 622 P.2d 297, 315 (1981). We believe that a judge who repeatedly demonstrates that she is unable or unwilling to adhere to the high standards expected of judges in Arizona cannot expect to remain a judge indefinitely.

We recognize, however, that Respondent's last three violations are attributable to an emotional reaction resulting from battered woman syndrome, which, according to Respondent's expert, is treatable.[5] We recognize also that judges and lawyers have personal lives and relationships, with all of the problems sometimes attendant. Such problems, we recognize further, have seriously

---

5. At Respondent's urging, the Commission found that the behavior that resulted in Respondent's last two disciplinary actions suggests that "she was under the stress of the same emotional condition [battered woman syndrome and sleep deprivation] when those incidents occurred."

affected Respondent, impaired her performance in office, and are part of the cause of the improper conduct in this and past cases. It is one thing, however, to have failed to perform to standards because of personal problems and another to commit a seriously improper act as a result of those problems. It is even more serious, if, as in the present case, a judge's recurring personal problem has caused her to commit repeated acts of abuse of office. In such a case, although we may understand the actions of a judge so affected, our duty to the public requires us to ensure that the judge will no longer be permitted to repeat such improprieties or abuse the judicial office.

Thus, we feel that an appropriate sanction in this case would be to suspend Respondent. Were we to remove Respondent, we would forever bar her from holding judicial office. *See* Ariz. Const. art. 6.1, § 4. Under these circumstances, removing Respondent goes farther than is necessary to protect the public. Because Respondent may be fit to hold judicial office at some time in the future, and because the City Council has removed her from office for the balance of her term, we conclude that the public will be adequately protected if we simply suspend Respondent effective the date on which the City Council removed her. In doing so, we follow a similar procedure and rule to that which we followed in *Goodfarb*. Because the action of the City Council ensures that Respondent will not serve the balance of her term, we need not struggle with the problem of deciding just what sanction would have been appropriate had the Council taken no action.

### CONCLUSION

We conclude that Respondent's conduct constitutes willful misconduct in office and is prejudicial to the administration of justice that brings the judicial office into disrepute. *See* Ariz. Const. art. 6.1, § 4. Respondent is therefore suspended, effective June 28, 1993, from holding judicial office for the remainder of her term, which expires April 7, 1997.

MOELLER, V.C.J., concurs.

FELDMAN, Chief Justice, specially concurring.

I agree with the court's analysis and result. I write separately only to indicate that I leave for another day the case in which a judge suffers from a mental impairment so serious that it deprives him or her of cognitive ability or volitional control. In my view, violation of the Rules of Judicial Conduct caused by such a mental impairment is generally to be handled only by compulsory retirement for disability rather than by sanction for willful misconduct or conduct prejudicial to the administration of justice. *See* Ariz. Const. Art. 6.1, § 4(A) and (B). The facts of this case do not involve such a situation.

ZLAKET, Justice, dissenting.

In view of *Jett v. City of Tucson,* 180 Ariz. 115, 882 P.2d 426 (1994), in which a majority of this court held that the Tucson City Council had the power to remove Judge Jett from office, I believe the issues presently before us are moot. Additionally, because of my disagreement with the legal analysis and sanction applied here, I respectfully dissent.

The Commission on Judicial Conduct, having viewed the witnesses and heard the evidence, unequivocally found that Judge Jett suffered from battered woman's syndrome and sleep deprivation at the time of the incident in question. This finding was based on *uncontroverted* expert testimony. Furthermore, undisputed evidence at the hearing established that these disorders resulted from a pattern of abuse by her male companion over a period of many months. In fact, the commission found that the evidence "suggests that she was under the stress of the same emotional condition" when two of her previous incidents of misconduct occurred, one of which resulted in a private informal reprimand and the other in a private informal admonition. The majority concedes all of this, yet inexplicably places substantial weight on these prior disciplinary events as part of a "pattern of misconduct" that constitutes a "strong aggravating factor." *Ante* at 109, 882 P.2d at 420. I cannot agree.

Relying on "our duty to the public," *ante* at 109, 882 P.2d at 420, the court suspends

Judge Jett from office for the remainder of her term, which expires in April 1997. Despite the majority's pronouncements to the contrary, this sanction would have effectively resulted in her removal from office if the city council had not already done so. *See Jett v. City of Tucson*, supra. Yet, a ten-person commission of judges, lawyers and public members came to a far different conclusion after viewing the witnesses firsthand, hearing their live testimony, questioning respondent and her counsel, and examining the exhibits in the context of all other evidence. That commission recommended a suspension of only 60 days. I am uncomfortable with such a significant disparity.

While I do not suggest that we should ever ignore our responsibility "for protecting the public," *ante* at 110, 882 P.2d at 421, or that it would be wise to restrict the court's power of de novo review, I reject the notion that our conclusions about what is best for the populace and the justice system are somehow more enlightened than those of citizens who together represent a significantly broader segment of society. In fact, they may be considerably less so, given the isolation that inevitably falls upon appellate judges.

What troubles me most, however, is the majority's implicit suggestion that a human justice system cannot tolerate human judges. I do not accept the premise that judges who succumb to the emotional stresses of daily living necessarily become unfit to serve. My belief is that those who are given the privilege of judging others should be able to recognize and understand, through their own personal experiences, the weakness and folly that go with being human. Otherwise we risk having a judiciary composed of arrogant, sanctimonious elitists—people with little humility or compassion, free of emotion in both their personal and professional lives, and well out of touch with the world. I can think of little that would be more dangerous to our society, and I daresay most citizens who encounter the justice system would agree.

Does this mean that I believe our judges should not be circumspect in what they say and do, or that they should not be careful to avoid conduct that would prejudice their actual or perceived abilities to sit impartially in the difficult and important task of determining the rights and obligations of other citizens? Of course not. Neither do I believe that we as a society should tolerate for one second the corrupt or evil judge who dishonors us all. But that is not what this case is about.

Judge Jett, under serious psychological stress, made a mistake. As the commission properly found, her conduct was prejudicial to the administration of justice. I do not condone what she did. We obviously should make every reasonable effort to see that her continued presence on the bench poses no threat to the public or the integrity of the justice system. I agree that she should be suspended until there is no doubt about her ability to serve fairly and impartially. In fact, I would have no problem with a longer suspension than that recommended by the commission *if* it was required to accomplish these ends. But there is nothing in this record to suggest that a suspension until 1997 is necessary. Thus, I believe that the sanction imposed by this court is extraordinarily harsh and unwarranted. In my judgment, it is also unsupported by the law and the evidence.

Moreover, the majority's discussion of "wilful misconduct," "good faith," and "bad faith" is confusing to say the least and, in my opinion, badly flawed. For example, the court cites *In re Hoover*, 155 Ariz. 192, 198, 745 P.2d 939, 945 (1987), in support of its conclusion that the "nature" of misconduct does not change merely because it "was the result of a mental condition." *Ante* at 106, 882 P.2d at 417. I am uncertain as to what that language means. In any event, I do not believe *Hoover* stands for such a proposition. Rather, that case concludes that while a mental illness may not act as a complete bar to discipline, "it must be considered in determining whether and what kind of discipline is to be imposed and what procedures are to be followed to protect the public." 155 Ariz. at 199, 745 P.2d at 946; *see also In re Couser*, 122 Ariz. 500, 596 P.2d 26 (1979) (citing with approval *Glenn v. State Bar of California*, 14 Cal.2d 318, 94 P.2d 43 (1939) (mental and

financial strain considered in mitigation)). This principle is obviously correct because we could not properly permit one who suffers from a debilitating mental illness to resume his or her duties as lawyer or judge, regardless of culpability. But that, again, is not this case.

Unlike in *Hoover*, we are apparently not dealing with a true mental illness. Nonetheless, evidence before the commission suggests that battered woman's syndrome may affect a victim's cognitive and volitional functioning. The uncontroverted expert testimony at hearing was, in part, as follows:

Q: Is the battered-woman syndrome a mental illness?

A: No, it's not.

Q: What is it, in psychological terms?

A: Battered-woman syndrome is a set of behaviors that are generally in response to recurrent traumatic experience. And it's accompanied often by depression, but the depression is not clinical depression, it's not [a] bipolar kind of thing, it's not something that is a mental illness that we diagnose, it is situation relevant. And when the situation is gone, the depression lifts.

It's also often accompanied by inability to make decisions. By memory loss, by insecurity, low self-esteem ..., that kind of thing produces a great deal of confusion and depression and uncertainty.

The only expert evidence produced at the hearing also conclusively established that, with some counseling, this judge can return to perform her duties as a city magistrate. Thus, the commission was justified in finding that she did not suffer from a long-term condition that rendered her unable to serve in an official capacity.

The commission also specifically found that this judge, by reason of her psychological stress, did not have "the requisite state of mind" to support a finding of "wilful misconduct." The words seem simple enough to understand. Yet, the opinion pursues a most convoluted course in reaching a definition of wilfulness that arguably permits a basis for its disagreement with the commission. In short, it states that "wilful misconduct" means "bad faith," which in turn means a "corrupt purpose," which in turn means "any purpose other than the faithful discharge of judicial duties." This last description is broad enough to cover almost any act of misconduct.

Thus, the opinion remarkably seems to impose a standard of strict liability in judicial discipline cases. I can think of no other area of law that does not permit consideration of an actor's mental state in assessing the legal implications of conduct, especially where a specific intent is required. It should be self-evident that Judge Jett's state of mind is essential to a determination of "wilful misconduct" and "bad faith." To say that "the nature of a judge's misconduct does not change merely because the misconduct was the result of a mental condition," *ante* at 106, 882 P.2d at 417, is a non sequitur. Moreover, because these are factual determinations, not legal ones, the commission was in the best position to make them.

The opinion quotes the following important language from *Spruance v. Commission on Judicial Qualifications*, 13 Cal.3d 778, 795, 532 P.2d 1209, 1221, 119 Cal.Rptr. 841, 853 (1975), in attempting to define judicial "bad faith," but seems to ignore its plain meaning: "In sum, 'bad faith' is quintessentially a concept of *specific intent*, requiring *consciousness of purpose* as an *antecedent* to a judge's acting maliciously or corruptly." *Id.* (emphasis added). The majority's attempt to make the facts of this matter fit within the foregoing definition seems extremely strained given the undisputed evidence of this judge's mental state during the time in question. I simply cannot see how the court can fail to give effect to the commission's finding that there was neither bad faith nor wilful misconduct here.

I also find it interesting that the opinion makes no attempt to distinguish *In re Hendrix*, 145 Ariz. 345, 701 P.2d 841 (1985), in which this court characterized similar conduct as merely "a series of thoughtless acts by a judge who had apparently forgotten the position she held and consequences of her actions." *Id.* at 349, 701 P.2d at 845. Despite the fact that the judge in that case had

used her office to obtain special privileges and favors for her clerk, the court agreed that her actions did not constitute "willful conduct in office," but only "violated the lesser standard of 'conduct prejudicial to the administration of justice that brings the judicial office into disrepute.'" *Id.* at 348–49, 701 P.2d at 844–45. The judge, who had no psychological impairment, was only censured.

Furthermore, the majority's observation here that "[w]e find no evidence, however, that suggests Respondent was acting in 'good faith,' under any definition of 'good faith,'" causes me great concern. *Ante* at 107, 882 P.2d at 418. It erroneously suggests that Judge Jett was under an obligation to demonstrate her "good faith." The burden, however, is upon those urging the existence of "bad faith" to prove it by clear and convincing evidence. *In re Haddad,* 128 Ariz. 490, 492, 497–98, 627 P.2d 221, 223, 228–29 (1981); *Geiler v. Commission on Judicial Qualifications,* 10 Cal.3d 270, 110 Cal.Rptr. 201, 203–04, 515 P.2d 1, 4 (1973), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974). That burden was not met here. In fact, after having stipulated to the expert's credentials, special counsel conceded that if the commission believed the uncontroverted expert testimony, it was "entitled, on this evidence, to make a judgment that Judge Jett's state of mind on this date was such that she did not consciously wilfully perform the acts that she did in bad faith."[1] The commission did exactly that.

Finally, I return to the prior disciplinary record which the majority finds to be "highly instructive on the public's need for protection from Respondent." *Ante* at 108, 882 P.2d at 419. As previously noted, the commission made mention of the fact that at least two of these prior incidents occurred at a time when Judge Jett was likely suffering from the same behavioral stresses. More importantly, however, all of the previous infractions were determined to be minor and resulted only in private admonitions[2] or reprimands,[3] both of which are among the lowest possible types of informal disposition. I do not agree that these infractions, when taken together, indicate "a pattern of hostile conduct unbecoming a member of the judiciary." *Ante* at 109, 882 P.2d at 420 (quoting *In re Deming,* 108 Wash.2d 82, 118, 736 P.2d 639, 658 (1987)). Neither did the members of the commission or special counsel.

I do agree that this judge needs to pay more attention to her conduct and the appearance it gives. A suspension should give her time to ponder these things and obtain continued counseling. Unlike the majority, however, I am unwilling to deny her credit for the fact that she reported her behavior promptly and admitted wrongdoing from the beginning. Such factors, together with remorse, have been considered strongly mitigating in other cases. *See, e.g., In re Harned,* 357 N.W.2d 300 (Iowa 1984) (Schultz, J., concurring in part, dissenting in part) (forthright and cooperative with commission); *In re Hormes,* 291 Md. 673, 436 A.2d 457 (1981) (same); *In re Kay,* 508 So.2d 329 (Fla.1987) (remorse); *see also In re Lorona,* 178 Ariz. 562, 875 P.2d 795 (1994) (failure to acknowledge wrongs considered in aggravation); *In re Peck,* 177 Ariz. 283, 289–90, 867 P.2d 853, 859–60 (1994) (accusatory, defensive tone with commission implicitly considered in aggravation).[4] I see no reason

---

1. The same concession was made by counsel in oral argument before this court.

2. An admonition is a private communication reminding a judge of ethical responsibilities and giving a gentle or friendly warning to avoid future misconduct or inappropriate practices. An admonition may be used to give authoritative advice and encouragement or to express disapproval of behavior that suggests the appearance of impropriety even though it meets minimum standards of judicial conduct. Commission on Judicial Conduct, "Definitions of Sanctions" (1992) (included in Commission on Judicial Conduct's Notice of Transmittal filed March 8, 1994). *See also* Rule 4(f)(2), Commission on Judicial Conduct, Rules of Procedure. Two of the prior infractions relied on by the majority were disposed of by simple letters of admonition.

3. "A reprimand is a private communication that declares a judge's conduct unacceptable under one of the grounds for judicial discipline but not so serious as to merit a public sanction." Commission on Judicial Conduct, "Definitions of Sanctions," *supra. See also* Rule 4(f)(1), Commission on Judicial Conduct, Rules of Procedure.

4. Of course, cooperation with disciplinary proceedings, voluntary disclosure to disciplinary authorities, and remorse are considered mitigating

why this matter should be treated differently.

While I concur that a period of suspension is appropriate for this judge, I respectfully disagree with the extraordinarily punitive length of time imposed by the majority. I also cannot subscribe to the court's analysis, especially as it pertains to the issue of mental impairment in judicial disciplinary matters.

MARTONE, Justice, concurring in part and dissenting in part.

I agree with the majority that this judge should be suspended. But I agree with Justice Zlaket that she should not be suspended for the full balance of her term. The majority says it "need not struggle with the problem of deciding just what sanction would have been appropriate had the Council taken no action." *Ante*, at 111, 882 P.2d at 422. I am of the view that because a period of suspension much shorter than the entire balance of her term is appropriate, the majority is simply avoiding the dilemma it creates for itself in acknowledging the power of the city council to suspend her at all. See *Jett v. City of Tucson*, 180 Ariz. 115, 124, 882 P.2d 426, 435 (Martone, J., dissenting) ("Suppose a city council removes the judge, but we believe a lesser sanction is appropriate."). I believe that today's decision is driven more by the majority's need to harmonize its result here with that in *Jett v. City of Tucson* than independent consideration and judgment.

in lawyer discipline cases. *See* Standards 9.32(e), (*l*), American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991).